#26817-a-LSW

**2014 S.D. 72**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                Plaintiff and Appellee,

　　　v.

TYSON ALLEN HAYES,                                Defendant and Appellant.


\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GLEN W. ENG
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

BETHANY L. ERICKSON
Assistant Attorney General
Pierre, South Dakota                                Attorneys for plaintiff
                                                    and appellee.


KRAIG L. KRONAIZL of
Blackburn & Stevens Prof. LLC
Yankton, South Dakota                               Attorneys for defendant
                                                    and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON AUGUST 25, 2014

OPINION FILED **10/15/14**

#26817

WILBUR, Justice

[¶1.]        Tyson Hayes appeals the circuit court's judgment and sentence for

second-degree rape and two counts of aggravated assault.  Hayes raises the

following issues: (1) whether the circuit court committed structural error by

allowing an improper reasonable doubt standard to be presented to jurors during

voir dire; (2) whether the State's questioning during voir dire amounted to

prosecutorial misconduct; (3) whether the circuit court erred in denying Hayes's

motion for acquittal because the State's evidence was insufficient to support his

convictions; and (4) whether the cumulative effect of the circuit court's errors denied

Hayes his constitutional right to a fair trial.  We affirm the circuit court.

## Facts and Procedural History

[¶2.]        On March 19, 2012, Hayes and R.S. began dating.  Thereafter, R.S.

moved in with Hayes for about a month.  In October 2012, R.S. and Hayes ended

their committed relationship.  Despite R.S. and Hayes both entering into a

relationship with other people, they continued to engage in sexual relations with

each other.  Hayes and R.S. engaged in consensual sex on November 4, 2012.

[¶3.]        On the evening of November 5, 2012, R.S. sent a series of text

messages to her niece that said that her relationship with Hayes was over because

it was "too hard with him" and her relationship with her new boyfriend "was just

easy."  At about 10:30 that evening, Hayes unexpectedly knocked on the back door

of R.S.'s apartment.

[¶4.]        Typically, Hayes sent R.S. a text message before he came over to her

apartment so that she would unlock the back door for him.  R.S. asked Hayes why

-1-

he had not sent her a text message before showing up at her apartment. Hayes responded by asking R.S. if she had something to hide and requested to see her phone. In the meantime, Hayes instructed R.S. to go into her bedroom and get undressed. Hayes proceeded to read the text message exchange between R.S. and her niece. Hayes subsequently became upset and ordered R.S. to put her clothes back on.

[¶5.]     Hayes searched for something to tie R.S. to her bed. R.S. and Hayes had previously engaged in consensual sexual relations involving binding with a jump rope. Hayes could not find the jump rope, so he tied R.S. to her bed with scarves that he found in her bedroom. As Hayes tied R.S.'s ankles and wrists, he told her he was going to kill her and asked her how she wanted to die. While R.S. struggled, Hayes pulled out handfuls of her hair, choked her, and sat on her chest. On one occasion, Hayes hit R.S. on the side of her head with his head.

[¶6.]     After some time, Hayes went to the kitchen and retrieved a six-inch-long, serrated knife from a butcher block. Hayes returned to the bedroom with the knife and held it against R.S.'s neck and lips. Hayes continued to choke R.S. throughout the attack and at certain points she began to lose her breath. He grabbed a pair of socks from R.S.'s dresser and stuffed them in her mouth. With R.S. still bound by the scarves, Hayes continued this attack until approximately 4:00 a.m. Eventually, R.S. complained that her arms were numb, and Hayes untied her from her bed.

[¶7.]     Immediately after Hayes untied R.S. from her bed, he led her into the bathroom with her wrists tied behind her back and her ankles bound together with

a scarf. Hayes told R.S. that he was going to use the knife to kill her in the bathroom. Hayes grabbed R.S.'s hair and held the knife to her neck. After R.S. pleaded for her life, Hayes told her that he would let her live if she agreed to buy him a new phone.

[¶8.] Hayes led R.S. back into the bedroom with the knife, untied her, and told her to undress herself. Hayes penetrated R.S. orally, rectally, and vaginally. Afterwards, Hayes directed R.S. to retrieve a towel and wash his genital area. R.S. testified that she complied and acted as normal as possible so that Hayes would leave her apartment. At 6:00 a.m., Hayes left R.S.'s apartment for work. Before Hayes left, he threatened R.S. that he would kill her and her children[1] if she told anyone and reminded her to buy him a new phone and bring it to his place of employment at 10:30 a.m. Immediately after Hayes left R.S.'s apartment, he sent her a text message that said "goodnight and dont [sic] forget."

[¶9.] R.S. testified that after Hayes left, she returned to her bedroom and fell asleep for one and a half hours due to mental and physical exhaustion. After she awoke, she took a shower and called her friend. Her friend answered the telephone and heard "[h]ysterical crying and inconsolable sobs" from the other end. R.S. told her friend about what Hayes had done, and her friend advised R.S. to report the attack to the police. R.S. called the Yankton Police Department and reported the assault.

---

1. R.S. has two adult children. R.S.'s daughter lived a short distance from R.S.'s apartment at the time of the attack. R.S.'s daughter arrived at the apartment the morning of the assault and transported R.S. to the hospital.

[¶10.] Officer Scott Silvernail, Detective Darren Moser, and Detective Todd Bailey arrived at R.S.'s apartment to investigate. Detective Moser and Detective Bailey took photographs and collected evidence from the apartment. During the investigation, Officer Silvernail observed the scarves that were used to tie R.S. to her bed. He also observed a large clump of R.S.'s hair that Hayes had pulled out in the bathroom area. Although Officer Silvernail did not observe any injuries, redness, or marks on R.S.'s face or ears, Detective Moser testified that he observed some bruising on her neck area.

[¶11.] At the hospital, Nurse Sandra Gehl of the Avera Sacred Heart Emergency Department examined R.S. for injuries and collected evidence using a rape kit. Nurse Gehl examined R.S. for the presence of petechiae and, finding none, testified that "[p]etechia is frequently found hours, . . . maybe even days after strangulation. It's not something that you see initially." Nurse Gehl collected swabs from both R.S. and Hayes. The vaginal, cervical, and anal swabs taken from R.S. tested positive for seminal fluid and matched the DNA sample collected from Hayes's swabs.

[¶12.] Hayes was charged with rape in violation of SDCL 22-22-1, and two counts of aggravated assault in violation of SDCL 22-18-1.1(2) and SDCL 22-18-1.1(8). A jury trial began on June 3, 2013. After the State rested, Hayes asked for "directed judgment of acquittal"[2] based upon the insufficiency of the evidence. The

---

2. The proper language is "motion for judgment of acquittal." According to SDCL 23A-23-1 (Rule 29(a)), "Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place . . . ." *See also*

(continued . . .)

circuit court denied Hayes's motion and ruled that the State provided sufficient evidence to support a verdict of guilty on all counts. On June 5, 2013, the jury found Hayes guilty, and the circuit court sentenced Hayes to ten years in prison on each count, to be served concurrently.

[¶13.] Hayes raises the following issues for our review:

1. Whether the circuit court committed structural error by allowing an improper reasonable doubt standard to be presented to jurors during voir dire.

2. Whether the State's questioning during voir dire amounted to prosecutorial misconduct.

3. Whether the circuit court erred in denying Hayes's motion for judgment of acquittal because the State's evidence was insufficient to support his convictions.

4. Whether the cumulative effect of the circuit court's errors denied Hayes his constitutional right to a fair trial.

## Analysis and Decision

[¶14.] **1. Whether the circuit court committed structural error by allowing an improper reasonable doubt standard to be presented to jurors during voir dire.**

[¶15.] Hayes argues that the circuit court committed structural error by allowing the State to compare the reasonable doubt standard to a jigsaw puzzle during voir dire. This analogy, Hayes contends, implanted an improper quantitative measure of reasonable doubt in the jurors' minds and conveyed the impression of a lesser standard of proof than is constitutionally required. As a

_____

(. . . continued)
*State v. Guthrie*, 2001 S.D. 61, ¶ 46, 627 N.W.2d 401, 420 ("[T]he motion for judgment of acquittal replaced the former motion for directed verdict.").

result, Hayes maintains that this alleged structural error requires his conviction to be reversed.

[¶16.] Constitutional errors are either structural or they are not. *Guthmiller v. Weber*, 2011 S.D. 62, ¶ 16, 804 N.W.2d 400, 406. A structural error "renders a trial fundamentally unfair[,]" *id.*, and "resists harmless error review completely because it taints the entire proceeding[,]" *id.* (quoting *State v. Levy*, 132 P.3d 1076, 1083 (Wash. 2006)) (internal quotation marks omitted). *See also Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S. Ct. 1246, 1265, 113 L. Ed. 2d 302 (1991) ("[S]tructural defects in the constitution of the trial mechanism . . . defy analysis by 'harmless-error' standards."). When there is a structural error, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Fulminante*, 499 U.S. at 310, 111 S. Ct. at 1265 (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 3106, 92 L. Ed. 2d 460 (1986)) (internal quotation marks omitted). A structural error so "affect[s] the framework within which the trial proceeds that automatic reversal is required." *Guthmiller*, 2011 S.D. 62, ¶ 16, 804 N.W.2d at 406 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282, 113 S. Ct. 2078, 2083, 124 L. Ed. 2d 182 (1993) (Rehnquist, C.J., concurring)) (internal quotation marks omitted).

[¶17.] The United States Supreme Court has found an error to be structural only when there has been "(1) a deprivation of the right to counsel; (2) a biased judge; (3) an unlawful exclusion of grand jurors of the defendant's race; (4) a deprivation of the right of self-representation at trial; (5) a deprivation of the right

to a public trial; and (6) *an erroneous reasonable doubt standard.*" *Guthmiller*, 2011 S.D. 62, ¶ 16, 804 N.W.2d at 406 (emphasis added) (citing *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999)).

[¶18.]     Here, the circuit court did not employ an erroneous reasonable doubt standard. The State, not the circuit court, analogized the reasonable doubt standard to that of a jigsaw puzzle. Moreover, the circuit court instructed the jury twice on the appropriate reasonable doubt standard. The circuit court provided the jury with a detailed description of the reasonable doubt standard prior to voir dire and again before jury deliberations. Hayes did not object to the jigsaw puzzle comparison. Thus, the circuit court was not given an opportunity to provide curative remarks.

[¶19.]     *People v. Katzenberger* is instructive on this issue. 101 Cal. Rptr. 3d 122 (Cal. Ct. App. 2009). In *Katzenberger*, the prosecutor, over the defense counsel's objection, compared the reasonable doubt standard to a jigsaw puzzle during closing arguments. The court found that structural error did not occur because there were no "instructions given by the trial court or comments made by the trial court under the cloak of its authority." *Id.* at 128. Instead, the court rationalized that the appropriate question was whether prosecutorial misconduct occurred.

[¶20.]     Likewise, the issue presented here does not concern instructions given by the circuit court or comments made by the circuit court under the cloak of its authority. Hayes's argument rests solely on the propriety of certain statements made by the State, and not the circuit court, and therefore no structural error was

committed.[3]  The appropriate analysis is whether the comments made during voir

dire amount to prosecutorial misconduct.

[¶21.]        **2.      Whether the State's questioning during voir dire**
                        **amounted to prosecutorial misconduct.**

[¶22.]        The standard of review for prosecutorial misconduct claims is abuse of

discretion.  *State v. Piper*, 2006 S.D. 1, ¶ 18, 709 N.W.2d 783, 794.  "An abuse of

discretion is a discretion exercised to an end or purpose not justified by, and clearly

against, reason and evidence."  *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 14, 826 N.W.2d

627, 633 (quoting *Hill v. Hill*, 2009 S.D. 18, ¶ 5, 763 N.W.2d 818, 822) (internal

quotation marks omitted).  "Under this standard, 'not only must error be

demonstrated, but it must also be shown to be prejudicial error.'"  *State v. Moran*,

2003 S.D. 14, ¶ 13, 657 N.W.2d 319, 324 (quoting *State v. Perovich*, 2001 S.D. 96, ¶

11, 632 N.W.2d 12, 15-16).

[¶23.]        "Prosecutorial misconduct implies a dishonest act or an attempt to

persuade the jury by use of deception or by reprehensible methods."  *State v. Lee*,

1999 S.D. 81, ¶ 20, 599 N.W.2d 630, 634 (quoting *State v. Knecht*, 1997 S.D. 53, ¶

---

3.      This Court recently addressed the issue of structural error during voir dire in
        *Guthmiller v. Weber*, 2011 S.D. 62, ¶ 16, 804 N.W.2d 400, 406.  In *Guthmiller*,
        the trial judge interrupted defense counsel and made improper comments.
        Defense counsel did not object to these comments.  This Court held that the
        improper comments did not fit into one of the six recognized categories of
        structural error and therefore the comments could not be classified as
        structural error.  Hayes argues that this case is distinguishable from
        *Guthmiller* because the State's explanation of the reasonable doubt standard
        fits into one of the six recognized categories for structural error—an
        erroneous reasonable doubt standard.  Thus, Hayes argues, structural error
        should be found.  We disagree.  In *Guthmiller*, the *circuit court judge* made
        the improper comments.  Here, *the State* made the improper comments.
        Accordingly, structural error analysis does not apply.

17, 563 N.W.2d 413, 420). This Court will find that prosecutorial misconduct has occurred if (1) there has been misconduct, and (2) the misconduct prejudiced the party as to deny the party a fair trial. *State v. Smith*, 1999 S.D. 83, ¶ 43, 599 N.W.2d 344, 354. If both prongs for prosecutorial misconduct are satisfied, this Court will reverse the conviction. *Id.*

[¶24.] A party must generally object at trial in order to provide the circuit court with an opportunity to correct the alleged error. *State v. Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d 288, 292. "If an issue of prosecutorial misconduct is preserved with a timely objection at trial, [this Court will] review the trial court's ruling under the standard of abuse of discretion." *State v. Ball*, 2004 S.D. 9, ¶ 49, 675 N.W.2d 192, 207. However, if an issue of prosecutorial misconduct is not properly preserved for appeal, this Court will analyze the claim under plain error. *Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d at 293.

[¶25.] "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." SDCL 23A-44-15 (Rule 52(b)). Not every error that occurs during trial constitutes plain error; therefore the plain error analysis "must be applied cautiously and only in exceptional circumstances." *Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d at 293 (quoting *State v. Davi*, 504 N.W.2d 844, 855 (S.D. 1993)) (internal quotation marks omitted). Plain error requires a showing of an "(1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *State v. Buchhold*, 2007 S.D. 15, ¶ 22, 727 N.W.2d 816, 822

(alteration in original) (quoting *State v. Nelson*, 1998 S.D. 124, ¶ 8, 587 N.W.2d 439, 443). "With plain error analysis, the defendant bears the burden of showing the error was prejudicial." *Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d at 293 (quoting *Nelson*, 1998 S.D. 124, ¶ 7, 587 N.W.2d at 443) (internal quotation marks omitted).

[¶26.]    Hayes contends on appeal that certain comments made by the State during voir dire, including comments about the standard of reasonable doubt, constitute prosecutorial misconduct. Hayes raises the issue of prosecutorial misconduct for the first time on appeal. He did not raise the issue by objection or by motion during any of the circuit court proceedings. Accordingly, the issue of prosecutorial misconduct was not properly preserved on appeal because Hayes's failure to object "deprived [the circuit court] of an opportunity to admonish the jury or give a curative instruction." *State v. Janklow*, 2005 S.D. 25, ¶ 47, 693 N.W.2d 685, 701; *see also State v. Handy*, 450 N.W.2d 434, 435 (S.D. 1990) (holding that the defendant's prosecutorial misconduct claim was waived due to the defendant's failure to make a timely objection). Because the issue of prosecutorial misconduct was not properly preserved, this Court's review is limited to plain error.

*Three objections.*

[¶27.]    Hayes objected during voir dire on three occasions on the basis that the State was testifying instead of asking questions and that, in essence, the voir dire amounted to closing argument.[4] Hayes asserts that the State was trying to

_____

4.    The State's voir dire comments and Hayes's three objections are as follows:

> **Prosecutor:** I want to talk about witness perception. How information is relayed. We, as human beings, we're not computers. . . . [W]ith everybody walking around with smart

(continued . . .)

(. . . continued)

phones, it's kind of seeming more and more we might be. But we do not take in information, process it and then submit an exact transcript of description or video of what happened. And when you put in someone experiencing a traumatic event, there is all sorts of different ways that that can manifest itself when that person –

**Defense attorney:** I'm going to object, your Honor. I think he's testifying, not asking a question.

**The court:** If you could ask questions, Mr. Johnke.

**Prosecutor:** Thank you, Your Honor. Does everyone understand that people are different, people process information differently because somebody gave information at one point in time and then we're talking this happened back on November 6. We're eight months out, seven months out from that. That sometimes some minor details may be different? Does everybody understand that? And to be honest with you, . . . if the story was exactly the same every single time, that would cause a whole different –

**Defense attorney:** I'm going to object again. Not asking any questions.

**The court:** If you'd ask it in the form of a question.

**Prosecutor:** Does everybody understand that witnesses can process information differently and just because somebody says something different at one time or in a different statement, that doesn't mean that they are lying? Does everybody understand that?

This is going to be a little tricky to talk about. I want to talk about bad judgment, bad decisions that people make. . . . I don't want to ask anybody what bad decisions that they've made. Probably everybody has made them. Does everybody here agree that bad judgment, bad decisions, does not mean that that person is not credible? That those are two separate things? Does everybody understand what I'm saying? That just because somebody puts themselves in a position that maybe you wouldn't when you are looking at it, you said I would have got out of there. That doesn't mean that they are not telling the truth about what happened. And . . . it wouldn't be appropriate as a juror to look at that person and judge them . . . because you would have done things differently. Does everybody agree with that?

(continued . . .)

improperly influence the potential jurors by planting seeds in their minds on certain key issues, and therefore the State committed prosecutorial misconduct.[5] After each objection, the circuit court intervened and instructed the State to ask a question. After the third objection, the court stated "I would ask that you form them in questions, please. . . . There is a statement first and then questions." The State's comments that were objected to were certainly improper. The State may not treat voir dire as closing argument.

---

(. . . continued)

> There are . . . lots of different reasons why crime happens, and . . . there's too many times where . . . victims are blamed for putting themselves in a situation where crime may occur, and . . . and people say . . . if only he hadn't built a nice new house in the middle of the bad area that –
>
> **Defense attorney:** I object. I don't mean to be this way. I think this is like –
>
> **The court:** Mr. Johnke, if you'd make sure –
>
> **Defense attorney:** – closing argument.
>
> **The court:** – you do it in the form of a question. I know that this is predicate, but I would ask that you form them in questions, please.
>
> . . . .
>
> **Prosecutor:** I'm trying to get across some complex ideas, and I apologize . . . these are certainly important issues that need to be discussed.

5.     As an alternative to prosecutorial misconduct, Hayes argues that the circuit court committed an abuse of discretion by not controlling the prosecutor's narrative or providing the jury curative remarks. Even if we were to apply an abuse of discretion standard of review, we see no abuse of discretion here.

*Reasonable doubt standard.*

[¶28.]    Next, Hayes claims that the State committed prosecutorial misconduct by employing an erroneous reasonable doubt standard during voir dire.[6]  Hayes contends that the prosecutor's explanation of the standard relied upon an inappropriate quantitative measure of reasonable doubt by utilizing a jigsaw puzzle analogy to suggest that if a concrete number of the puzzle pieces were in place, the jury must conclude that the evidence demonstrates guilt beyond a reasonable doubt.

[¶29.]    Here, Hayes has the burden to show that the State's explanation of the reasonable doubt standard affected his substantial rights in a way that seriously affected the fairness, integrity, or public reputation of the trial.  Hayes has not satisfied this burden.  The circuit court provided the jury with the appropriate reasonable doubt standard prior to voir dire and again before jury deliberations.

---

6.    The State's jigsaw analogy is as follows, in pertinent part:

> **Prosecutor:** The burden of proof in a criminal case is heavier than that [of a civil case].  We're required to prove more and that is the way the system is and it's important that it's that way so that our system progresses and that . . . we don't convict an innocent person. . . .  But it's also not beyond a scientific doubt, beyond all doubt.  It's got to be a reasonable doubt. . . . [B]asically there is an analogy about a puzzle and I really don't like it, but it is probably the best thing to explain it.  If you have a 100 piece puzzle and you are missing 10 pieces and it's a picture of a bear and you can see the head and the paws and the fur and maybe there is a tree behind it and you are missing 10 pieces here and there, you still know it's a bear.  It's not going to all of a sudden you plug in those 10 pieces, it's going to turn into a space alien or a space ship or something like that.  That's what we're talking about with reasonable doubt.  I don't have to get a lab test up here. . . .  [N]obody would ever be convicted of a crime if that were . . . the criteria and that's now what is required.

Hayes has not provided any evidence to indicate that the jury did not heed the instructions of the circuit court.[7]

*Hypothetical questioning.*

[¶30.]    Hayes also claims that the State committed prosecutorial misconduct during voir dire by improperly "staking out" jury commitments on factual scenarios and questioning jurors on hypothetical scenarios that were identical to the actual facts of this case.  Hayes did not object to these hypothetical questions.

[¶31.]    "Latitude allowed to counsel in voir dire of prospective jurors rests largely in the trial court's discretion." *State v. Miller*, 429 N.W.2d 26, 38 (S.D. 1988).  "In deciding whether questions exceed the proper scope of voir dire, courts can look to whether they: (1) seek to uncover biases, prejudgments, or prejudices; (2) attempt to ascertain impartiality and qualifications; or (3) undertake to entrap, influence, or obtain a pledge on issues expected to arise in trial." *State v. Scott*, 2013 S.D. 31, ¶ 13, 829 N.W.2d 458, 464.  "While prospective jurors may not be questioned with respect to hypothetical sets of facts expected to be proved at trial,

---

7.    Some courts have held that the use of an improper quantitative measure to explain the reasonable doubt standard constitutes misconduct, thereby satisfying the first prong of prosecutorial misconduct. *See, e.g.*, *People v. Katzenberger*, 101 Cal. Rptr. 3d 122, 127 (Cal. Ct. App. 2009) (finding misconduct for the analogy of an eight piece jigsaw puzzle of the Statute of Liberty); *Lord v. State*, 806 P.2d 548, 552 (Nev. 1991) (finding misconduct for the analogy that "having 90-95% of the pieces of a puzzle suffices to convict beyond a reasonable doubt"); *United States v. Pungitore*, 910 F.2d 1084, 1128 (3rd Cir. 1990) (finding misconduct for the analogy of "a 500 piece jigsaw puzzle with 8 pieces missing"); *People v. Wilds*, 529 N.Y.S.2d 325, 327 (N.Y. App. Div. 1988) (finding misconduct for the analogy of a jigsaw puzzle of Abraham Lincoln).  Because the question is not squarely presented, we do not resolve the issue of whether a prosecutor's use of a quantitative measure to explain the reasonable doubt standard constitutes prosecutorial misconduct.

#26817

thus committing them to a decision in advance, they may be subjected to hypothetical questions about their mental attitude toward certain types of evidence." *State v. Moeller*, 2000 S.D. 122, ¶ 50, 616 N.W.2d 424, 441 (quoting *Miller*, 429 N.W.2d at 38) (internal quotation marks omitted).

[¶32.] Here, the State posed a series of hypothetical questions to the jurors, several of which closely mirrored certain factual aspects of this case. Hayes argues that this demeaned the viewpoints of prospective jurors with condescension, and by employing the use of these hypothetical questions, the State inappropriately sought to "stake out" jury commitments. *See Moeller*, 2000 S.D. 122, ¶ 53, 616 N.W.2d at 442 (stating that "staking out" juror responses is not permitted).

[¶33.] The first set of hypothetical questions[8] asked the prospective jurors to consider a situation where a person builds a house in a high crime area and the person does not set up a burglary alarm system, or a situation where a person withdraws money from an ATM at midnight in a poorly lit area. The State asked the prospective jurors whether they believed the person is "asking to be robbed." The State specifically asked the jurors, "[D]oes everyone agree that that's just not the case?" This first set of hypothetical questions related to the issue of consent—a

---

8. The State's first set of hypothetical questions is as follows:

> **Prosecutor:** [I]f somebody builds a house in a . . . high crime area, do they deserve to be robbed? [I]f you wouldn't have built this house there, you wouldn't have been robbed . . . or if he doesn't put a burglary alarm in there . . . is he asking to be robbed? Does everybody agree that that's just not the case? That that's wrong? Same kind of situation, if at midnight somebody pulls money out of an ATM in a dark, poorly lit area, bad part of town, and they are robbed, are they asking for it? Does anybody think that . . . the victim did something wrong?

-15-

key issue expected to arise at trial. The State improperly exceeded the scope of voir dire by seeking to obtain a pledge on this key issue.

[¶34.] After the first set of hypothetical questions, the State posed another hypothetical question[9] describing a situation where a rape occurred and the victim waited two hours before calling law enforcement. The State asked the prospective jurors whether they believed that a victim had to immediately report the rape in order to be credible. This hypothetical question closely resembled the actual facts of this case, as R.S. waited a couple hours before calling law enforcement. Furthermore, the hypothetical question related to another key issue—R.S.'s credibility. For this hypothetical question, the record does not indicate any attempt by the State to obtain a pledge similar to the first set of hypothetical questions.

[¶35.] However, the State's second hypothetical question amounted to improper argument. The purpose of voir dire is not to present argument, but to procure a fair and impartial jury. *See State v. Fool Bull*, 2009 S.D. 36, ¶ 44, 766 N.W.2d 159, 169 (quoting *State v. Daniel*, 2000 S.D. 18, ¶ 11, 606 N.W.2d 532, 534) (internal quotation marks omitted) (recognizing that the purpose of voir dire "is to

---

9.  The State's second hypothetical question as to the alleged time frame is as follows:

    > **Prosecutor:** [Y]ou'll hear testimony that this . . . rape occurred and then approximately—I don't want to set the time frames, because it's not exact, but approximately two hours later a call was made to law enforcement. Does anybody think that you have to call right away? That once something happens, you've got to . . . know what happened and you better or otherwise you just weren't raped? Does anybody here believe that? Does anybody think that they might not be as likely to believe a person if . . . immediately after they were able to safely call 911, but they didn't do so?

enable counsel to determine whether any prospective jurors . . . are possessed of beliefs which would cause them to be biased in such a manner as to prevent his client from obtaining a fair and impartial trial"). *See also Scott,* 2013 S.D. 31, ¶¶ 10-14, 829 N.W.2d at 462-64 (acknowledging that the State's questioning during voir dire "might have touched a fine line—especially in suggesting why the victim might not testify, knowing that no evidence on the question would be offered at trial"). The State's use of argument improperly sought to influence the jury on the key issue of R.S.'s credibility and therefore exceeded the scope of voir dire.

*DNA evidence and medical testing.*

[¶36.]	Finally, Hayes contends that the State inappropriately told the prospective jurors during voir dire that DNA evidence, medical tests, and medical records were not available and would not help determine whether Hayes was guilty of the alleged crimes.[10] Hayes argues that this evidence was available and the State's failure to request the evidence provided the State with an incentive to demean the value of the evidence in the jurors' minds and to assess the jurors'

---

10.	The State's statement regarding the DNA evidence and medical tests is as follows:

> **Prosecutor:** [Y]ou are going to hear about DNA. I don't think it's going to be at great length and I don't think there is really going to be any dispute over what the evidence shows, and it really does not bear on the primary issue in this case, which is consent for sexual intercourse. That's the issue and . . . there is not a test anywhere that can determine that. There is no medical test. There is no medical records. Nothing can determine that but except for witness testimony and things of that nature. That's . . . where the proof comes from on those key issues.

reactions to such diminution.[11]  Specifically, Hayes points out that the State did not submit the knife, socks, or scarves used during the attack to the state laboratory for testing.  Again, the State's comments improperly exceeded the scope of voir dire by seeking to influence the prospective jurors on an issue expected to arise at trial— namely, the issue of credibility.  These comments amounted to improper argument during voir dire.

[¶37.]     Under plain error analysis, any error that is found must affect Hayes's substantial rights in order to be reversible error.  Specifically, to obtain relief, Hayes must demonstrate that the error affected the outcome of the proceeding.  *Beck*, 2010 S.D. 52, ¶ 17, 785 N.W.2d at 294.  The State made comments during voir dire that amounted to error that is plain.  However, "[i]n South Dakota, due process does not guarantee a defendant the right to an error-free trial, nevertheless it must be a fair trial." *Smith*, 1999 S.D. 83, ¶ 52, 599 N.W.2d at 355.  It is apparent from the record that Hayes received a fair trial.  The circuit court provided the jury with the correct reasonable doubt standard, and as discussed below in issue 3, the jury was presented with overwhelming evidence in favor of finding Hayes guilty of the charged crimes.  Accordingly, Hayes has not met his burden to establish that his substantial rights were impacted by the prosecutor's comments during voir dire.

[¶38.]     **3.    Whether the circuit court erred in denying Hayes's motion for judgment of acquittal because the State's evidence was insufficient to support his convictions.**

---

11.    It is important to note that, during closing argument, the defense counsel stated that "those DNA results mean absolutely nothing to the context of this case."

[¶39.]     The standard of review for denial of a motion for judgment of acquittal is de novo. *State v. Doap Deng Chuol*, 2014 S.D. 33, ¶ 36, 849 N.W.2d 255, 264. This Court must determine "whether the evidence was sufficient to sustain the conviction." *State v. Guthmiller*, 2014 S.D. 7, ¶ 21, 843 N.W.2d 364, 371 (quoting *State v. Dowty*, 2013 S.D. 72, ¶ 15, 838 N.W.2d 820, 825) (internal quotation marks omitted). "The question is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *State v. Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d 145, 149 (quoting *State v. Morgan*, 2012 S.D. 87, ¶ 10, 824 N.W.2d 98, 100) (internal quotation marks omitted). "We will not 'resolve conflicts in the evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence.'" *Id.* "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.*

*Rape in the second degree.*

[¶40.]     Hayes was charged with and convicted of rape in violation of SDCL 22-22-1(2), which provides:

> Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:
>
> . . .
>
> (2) Through the use of force, coercion, or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution;

[¶41.]     The State had the burden to prove (1) Hayes sexually penetrated R.S. through (2) the use of force, coercion, or threat of immediate and great bodily harm to R.S., accompanied by the apparent power of execution. Hayes alleges that the

State did not sufficiently satisfy these two elements. Specifically, Hayes alleges, inter alia, that R.S.'s vaginal swabs contained the DNA of two separate individuals, that there was no way to scientifically determine that the semen came from Hayes on the night of November 5 and the morning of November 6, that the State did not submit certain objects for fingerprinting, and that the State did not submit the knife for proper analysis. However, the relevant question is not whether certain evidence was absent from trial; the relevant question is whether "there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d at 149 (quoting *Morgan*, 2012 S.D. 87, ¶ 10, 824 N.W.2d at 100) (internal quotation marks omitted).

[¶42.]      R.S. testified extensively regarding the events of November 5 and November 6, 2012. Specifically, R.S. provided testimony that Hayes sexually penetrated her orally, anally, and vaginally.[12] The testimony was corroborated by Nurse Gehl's testimony that R.S.'s vaginal swabs tested positive for seminal fluid, and the DNA contained therein matched Hayes's DNA. Thus, the jury could reasonably believe that Hayes sexually penetrated R.S.

[¶43.]      The second prong is whether Hayes used force, coercion, or threat of immediate and great bodily harm to R.S. R.S. testified that Hayes held a knife to

---

12.    The victim's testimony is sufficient evidence to sustain a conviction for a sex crime. *State v. Gonzalez*, 2001 S.D. 47, ¶ 18, 624 N.W.2d 836, 840; *see State v. Cates*, 2001 S.D. 99, ¶¶ 10-13 n.6, 632 N.W.2d 28, 33-35 n.6 ("The corroboration requirement for testifying sex crime victims no longer exists."). Nonetheless, R.S.'s testimony was also corroborated by witness testimony and circumstantial and forensic evidence.

her neck, threatened to kill her with the knife, pulled her hair out, hit her on the head with his head, sat on her chest, stuffed socks in her mouth, and choked her with his hands. In addition, Nurse Gehl testified that, while in the emergency room, R.S. was upset, crying, and lying on the exam table in the fetal position. R.S.'s friend also testified that she heard "hysterical crying and inconsolable sobs" when R.S. called her after the attack.

[¶44.]     Detective Moser testified that he observed bruising to R.S.'s neck consistent with R.S.'s assertion that Hayes repeatedly choked her with his hands. Detective Moser testified to photographs that he took at the scene of the crime. The photographs were also introduced into evidence for the jury to view. The photographs depicted bruising on R.S.'s neck and red marks on the back of her neck consistent with her testimony that Hayes held a knife to her neck. Furthermore, the photographs displayed bald patches on R.S.'s head and large amounts of her hair in the bathroom, which is consistent with R.S.'s testimony that Hayes pulled her hair out. R.S.'s friend, a hairdresser, testified that she regularly cut R.S.'s hair and the bald patches did not exist prior to November 6, 2012.

[¶45.]     The evidence was sufficient to support Hayes's conviction for rape.

*Two counts of aggravated assault.*

[¶46.]     The jury also convicted Hayes of two counts of aggravated assault in violation of SDCL 22-18-1.1(2) and SDCL 22-18-1.1(8), which provide:

> Any person who:
>
>> . . .
>> (2) Attempts to cause, or knowingly causes, bodily injury to another with a dangerous weapon;
>> . . .

(8) Attempts to induce a fear of death or imminent serious bodily harm by impeding the normal breathing or circulation of the blood of another by applying pressure on the throat or neck, or by blocking the nose and mouth;

is guilty of aggravated assault.

[¶47.] There is sufficient evidence in the record to support Hayes's conviction of aggravated assault. R.S. testified that Hayes both attempted and knowingly caused bodily injury with a knife. This was corroborated by Detective Moser's observation of red marks on the back of R.S.'s neck consistent with R.S.'s testimony that Hayes held the knife to her neck. Furthermore, R.S. testified that she feared death or immediate bodily harm when Hayes impeded her breathing by strangling her neck with his hands and by stuffing socks into her mouth. The knife and the socks were both introduced into evidence for the jury to see. For these reasons, we hold that Hayes's motion for a judgment of acquittal for both counts was appropriately denied.

[¶48.] **4. Whether the cumulative effect of the circuit court's errors denied Hayes his constitutional right to a fair trial.**

[¶49.] Because of our ruling on the preceding issues, we need not reach this issue.

## Conclusion

[¶50.] The circuit court did not commit structural error by allowing the State's reasonable doubt standard to be presented to the jurors during voir dire. While the State made improper comments during voir dire, the errors did not affect Hayes's substantial rights or prejudice him. The circuit court did not err in denying Hayes's motion for judgment of acquittal based on insufficient evidence. We affirm.

#26817

[¶51.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and

SEVERSON, Justices, concur.