#26321-aff in pt & rem-JKK

**2013 S.D. 31**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

DERRICK P. SCOTT,                         Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARY THORSTENSON
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CRAIG M. EICHSTADT
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


PAUL PIETZ of
Rensch Law Office
Rapid City, South Dakota                  Attorneys for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 8, 2013

OPINION FILED **04/03/13**

KONENKAMP, Justice

[¶1.] Defendant was convicted of aggravated assault. On appeal, he alleges multiple errors in his trial. We affirm all issues but one. On that issue, we remand for further proceedings on a potential *Batson* violation.

## Background

[¶2.] At 2:30 a.m. on July 16, 2011, Officer Evan Harris responded to a 911 call near North Maple Street in Rapid City. On arriving, he saw a shirtless man, Derrick P. Scott, pulling a woman, Theda Mesteth, across the parking lot. Mesteth began waving her hands at the officer and pulled away from Scott. On approaching Scott, the officer noticed blood smears across his chest and arms. Scott was handcuffed and seated in the patrol car.

[¶3.] Mesteth was lying nearby. Her face was swollen and covered in blood. Concerned that her cheekbones were broken, the officer did not attempt to move her. He tried to keep her calm while awaiting medical assistance. In the meantime, Officer Michael Shyne arrived and photographed Mesteth's injuries. An ambulance took her to the hospital.

[¶4.] Earlier that evening, according to trial testimony, Wenona De'Sersa came home from work to find Scott and his brother drinking in the living room. She lived in her cousin's home with Mesteth and Mesteth's five-month-old son. Scott is the baby's father. At some point later, everyone was drinking.

[¶5.] Around 2:00 a.m., Mesteth and Scott got into an argument: Scott had used Mesteth's phone to call another woman. Mesteth grabbed the phone from Scott's hands and picked up her son. As she walked out of the living room and into

the kitchen, Scott followed. De'Sersa testified that Scott wrapped his arms around Mesteth's neck in a chokehold, causing her baby to slide down her body and onto the floor. De'Sersa tried to stop Scott, but he punched her on the side of her head. Scott continued his chokehold until Mesteth went limp. De'Sersa's nephew grabbed the baby, retreated to a bedroom, and locked the door. Scott dropped Mesteth, who fell unconscious to the kitchen floor, and ran after his son.

[¶6.]     Scott yelled for his son and kicked the door, but ultimately came back to the kitchen. He grabbed Mesteth by the hair and punched her twenty times, by De'Sersa's count. He then dragged Mesteth outside through the entryway and continued to punch her. De'Sersa followed begging Scott to stop. He punched De'Sersa in the chest. Scott continued to punch and kick Mesteth until the police arrived.

[¶7.]     At the hospital, an emergency room nurse, Robin Johnson, attended to Mesteth. Johnson noted that Mesteth's face was "really swollen, black and blue on the right side," and that she was complaining of pain in her jaw and face, saying it hurt at the level of 10 on a scale of 1 to 10, with 10 being the most painful. Johnson also noted that Mesteth had slurred speech, but specifically observed that it was not similar to that of an intoxicated person. Mesteth told Johnson that she was punched and choked until she became unconscious.

[¶8.]     Mesteth had been placed in a cervical collar. After a CT scan revealed no head injuries, Johnson removed the collar. With the collar gone, Johnson noticed a pool of blood beneath Mesteth's upper shoulder area, caused by an apparent stab wound. Mesteth also had a laceration behind her ear. Both wounds received

stitches. Mesteth suffered neither broken bones nor brain injuries. She remained in the hospital for three days.

[¶9.] Mesteth did not testify at trial, but Scott was nonetheless convicted by a jury of aggravated assault. He then admitted to being a habitual offender, and the circuit court sentenced him to eleven years in the penitentiary. Scott appeals asserting that the court (1) abused its discretion when it allowed improper questioning during the State's voir dire, (2) allowed a *Batson* violation when the State exercised a preemptory challenge of a Native American juror, (3) abused its discretion when it admitted certain photographic evidence, (4) abused its discretion when it permitted a domestic violence expert to testify, (5) violated his right of confrontation by restricting his cross examination of the emergency room nurse, and (6) erred when it denied a judgment of acquittal for insufficient evidence to sustain the verdict.[1]

## Analysis and Decision

### 1. Voir Dire

[¶10.] Scott argues that the State's questions during jury selection implanted notions in the prospective jurors' minds that would not later be supported by the

---

1. Standards of review: The latitude afforded to questioning during voir dire is reviewed for an abuse of discretion. *State v. Miller,* 429 N.W.2d 26, 37-38 (S.D. 1988). Although a court's finding of no purposeful discrimination on a challenge of a State's preemptory strike under *Batson* is reviewed for clear error, our review of the court's application of the law is de novo. *State v. Owen,* 2007 S.D. 21, ¶ 11, 729 N.W.2d 356, 362. The court's evidentiary rulings are reviewed for an abuse of discretion. *State v. Engesser*, 2003 S.D. 47, ¶ 15, 661 N.W.2d 739, 746. A claimed violation of a constitutional right is reviewed de novo. *State v. Tiegen*, 2008 S.D. 6, ¶ 14, 744 N.W.2d 578, 585

(continued . . .)

evidence. According to Scott, the State went beyond asking potential jurors whether they would be able to convict Scott if Mesteth did not testify or whether they would be biased because Mesteth might not testify. In Scott's view, the State sought to "educate" potential jurors on reasons why victims of domestic violence might not testify, and thereby persuade them to the State's viewpoint and test its trial strategy of not calling Mesteth as a witness.

[¶11.]    When this issue arose during voir dire, Scott timely objected, and the court took a short recess to address it. Scott contended in chambers that the State's questions were an attempt to speculate with potential jurors why Mesteth would not testify. In response, the State asserted that "this is a point to educate the jury." The court replied, "No, it's not to educate the jury. It's to get a fair and impartial jury." The court directed the State to keep its questions general, "no different than how do people perceive and have an attitude about alcohol. If there's an idea that this may be domestic violence, do people have a misperception or a prejudice towards that and that's what you want to get [for] a fair and impartial jury."

[¶12.]    Back in court, the State asked the following questions:

> **State:** [W]hat do you think of when you hear the terms domestic violence or domestic abuse?
>
> **Potential Juror:** Usually it's while people that are living together, it's right in the home, there's violence going on or abuse. It could be one or both parties, whoever.
>
> **State:** There's usually two parties involved?
>
> **Potential Juror:** I think so. I guess there could be more.

---

(. . . continued)
    (citations omitted). Similarly, a claim of insufficient evidence is reviewed de novo. *State v. Morse*, 2008 S.D. 66, ¶ 10, 753 N.W.2d 915, 918.

**State:** And when you think about domestic, when you put that domestic word on there, what do you think, like what type or what people are you thinking about?

**Potential Juror:** Probably specifically people that are married or live together.

**State:** Or living together. Would it surprise you to know that domestic violence can apply to family members, too?

**Potential Juror:** Yes, like children.

**State:** Okay. Or brothers and sisters and stuff like that?

**Potential Juror:** No, that doesn't surprise me.

**State:** That makes sense to you.

**Potential Juror:** Yes.

**State:** Does anybody here - - how many of you feel that prosecuting domestic violence crimes is a waste of taxpayer money? Does anybody think that what happens in the home stays in the home? Now, why does the State or why does law enforcement need to get involved? Does anybody feel like that?

**Potential Juror:** Yes.

**State:** Do you feel like that? Do you question the State why we would get involved in domestic violence situations?

**Potential Juror:** No, because a lot of those, I think if you're involved, at that point somebody needs to stand up for the victim.

**State:** Okay. When you say "somebody needs to stand up for the victim," what do you mean by that?

**Potential Juror:** Well, to me, most of the times if it's maybe a domestic thing, one spouse will not go against the other spouse for whatever reason it is, maybe there's kids involved, planning a family, family relationships being affected, but if there's been an actual harm, somebody still needs to stand up for that victim.

**State:** Okay.

**Potential Juror:** So I guess that's where I see the State stepping in and doing so. They probably don't, you know, have means to, quote, sue them. It's not a civil matter.

**State:** Okay. So would you agree that it's - - if I told you that it is the State that brings the charges against the domestic abuser and not the victim?

**Potential Juror:** Yes.

**State:** Okay. Thank you. [ ] Would it surprise you if a victim, as we were just kind of talking about, would not come in and testify against her abuser in court?

**Potential Juror:** No, that doesn't surprise me at all.

**Scott:** Objection.

**Court:** Overruled. Go ahead.

**State:** It wouldn't surprise you?

**Potential Juror:** That she wouldn't come in and testify or the victim wouldn't come in and testify?

**State:** Yes.

. . .

**State:** What are some of the things or why would that not surprise you?

**Potential Juror:** Scared; maybe scared to testify against her abuser.

**State:** Thank you. Does anybody else have any reasons why they think a victim of domestic violence would not come in and testify against her abuser?

**Potential Juror:** A possible restraining order that is in place and one or the other has to be in the courtroom but both can't be unless otherwise forced by law enforcement.

**State:** And generally protection orders, I think it's fair to say this, kind of become null when both parties need to be inside the courtroom. That's - - yes, protection orders, there might be a protection order. Anybody have anything else?

**Scott:** I would ask to renew my objection.

**Court:** Overruled. [State], move forward.

**State:** Thank you. What are some other reasons?

**Potential Juror:** Children.

**Potential Juror:** Ashamed.

**State:** What do you mean by that?

**Potential Juror:** They feel - - they just feel ashamed personally. They don't want it made public or whatever.

**State:** Ashamed about the circumstances? Ashamed about the whole thing?

**Potential Juror:** (Nodding head.)

. . .

**State:** Do you think it's - - I didn't hear anybody say this one, but do you think it's possible for a victim of domestic abuse to still care about her abuser?

**Potential Juror:** Yes.

**State:** Does anybody think that that would be a reason, maybe, why a victim wouldn't want to come in and testify - -

**Potential Juror:** Yes.

**State:** [D]on't want to get her abuser in trouble? Would you all agree with that?

**Potential Juror:** Yes.

**State:** Do you think - - I'll pick on someone here. . . . Do you think victims of domestic abuse react differently or the same than, say, the victim of a - - some random person breaks into their car?

**Potential Juror:** I would think so.

**State:** Okay. In what way?

**Potential Juror:** Um, you know, a car break could just be an act of random mischief.

**State:** Do you think a victim of a car break-in, somebody just steals their stereo - -

**Potential Juror:** It's not personal.

**State:** Yeah. Exactly. Based on that, do you think a person who's a victim of a car theft will be more likely to proceed with the prosecution against the unknown person or the investigation? Are they going to have the same hesitations as a victim of domestic violence?

**Potential Juror:** Potentially. Fear was mentioned. You could fear the assailant, I suppose. I wouldn't think that it would be as, what I'm looking for, as emotionally involved as what we're speaking of.

**State:** Okay. Yeah. Yeah. You're not going to have that personal relationship, I think is the best way to say that.

**Potential Juror:** Sure.

. . .

**State:** Are there any of you in here - - or who in here would say - - who in here would be inclined to say, you know, if the victim isn't going to testify about this, if she's not going to come in, then why should we care? Not guilty. Does anybody feel like that?

> (No response.)
>
> **State:** Do you all promise that it's about reasonable doubt; that if the State proves their case beyond a reasonable doubt, you will find the Defendant guilty?

[¶13.]     Prospective jurors may be properly questioned about their attitudes on certain types of evidence, but it is improper to present them with hypothetical facts and ask them to commit to a decision based on those facts. *State v. Moeller*, 2000 S.D. 122, ¶ 50, 616 N.W.2d 424, 441 (citation omitted). Counsel cannot "stak[e] out" juror commitments, except to obtain a promise that they will remain attentive and follow the court's instructions. *See id.* ¶ 53. In deciding whether questions exceed the proper scope of voir dire, courts can look to whether they: (1) seek to uncover biases, prejudgments, or prejudices; (2) attempt to ascertain impartiality and qualifications; or (3) undertake to entrap, influence, or obtain a pledge on issues expected to arise in trial. *See* SDCL 23A-20-13.1; *State v. Fool Bull*, 2009 S.D. 36, ¶ 44, 766 N.W.2d 159, 169; *see also State v. Iromuanya*, 806 N.W.2d 404, 425 (Neb. 2011); *Commonwealth v. Bridges*, 757 A.2d 859, 872 (Pa. 2000), *abrogated in part by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003).

[¶14.]     Some of the State's questions here might have touched a fine line — especially in suggesting why the victim might not testify, knowing that no evidence on the question would be offered at trial. But, on the whole, the questions probed the minds of potential jurors to determine whether they had predispositions about a case involving domestic violence and a victim who might not testify for some unknown reason. These questions did not evince an attempt to entrap, influence, commit, or obtain a pledge from prospective jurors. Thus, we find no abuse of discretion in the circuit court's rulings.

### *2. Batson Challenge*

[¶15.]    Scott next argues that the circuit court applied the wrong legal standard when it overruled his claim that the State violated *Batson* in striking a Native American juror.  During jury selection, when the State struck Juror Laroche, Scott objected, contending that it was done solely because she is Native American. The State denied the claim, and the following exchange took place, outside the hearing of the jury:

> **State:** I asked her one question and I just didn't get a good feeling from her response.  I also know, it's my understanding that Ms. Laroche has recently, I believe, been involved in criminal activity wherein I think she was charged or at least investigated for like threatening behavior on a phone and I just — it's not because she's Native American.  I just don't think she, based on her answers today and other reasons, I don't think that she would be a fair juror in this case.
>
> **Court:** All right.  [Defense Counsel.]
>
> **Defense Counsel:** Well, one, I believe the one question he asked, she agreed with his comment on domestic violence, and I'm not aware and apparently not privy to a lot of the other information that the State is suggesting they have on her.
>
> **Court:** But it does indicate that there is a non-racial or gender based exclusion if this is, in fact, the information.  And we only have one person.  There's not been a pattern here.  It's just one.
>
> **State:** There were three, Your Honor, were Native.
>
> **Defense Counsel:** Well, but it's the only basically Native American looking one in the bunch.
>
> **Court:** Now - -
>
> **Defense Counsel:** And I want to comment that her juror questionnaire does not say that she's been involved with a crime or any kind of criminal activity, so if the State has got this information about jurors, they should have been providing that to us.
>
> **Court:** It's available to anyone.  I don't know, if she didn't write it down, what I am going to say?  At this point, my concern is you're saying that because one of the Native American people is being removed from this jury, that that in and of itself is, in fact,

showing a racial exclusion, and I don't know that one rises to that level given what the State has indicated as relevant, all the circumstances. There hasn't been a pattern of striking jurors of any certain categories in this. And I just — I'm not seeing purposeful discrimination. So, with that I guess we'll proceed.

[¶16.]     The test to determine whether a *Batson* violation has occurred is well-settled:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [*Batson v. Kentucky*,] 476 U.S. [79,] 93-94, 106 S. Ct. 1712[, 1721, 90 L. Ed. 2d 69 (1986)] (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S.[ ] at 94, 106 S. Ct. 1712; *see also Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam).

*Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129 (2005).[2]

[¶17.]     Here, Scott established a prima facie case for purposeful discrimination in the preemptory strike of Juror Laroche, a Native American. *See Owen,* 2007 S.D. 21, ¶ 45, 729 N.W.2d at 369. In response, the State offered the race-neutral explanation that it did not get a good "feeling" from Juror Laroche

---

2.     *See Miller–El v. Dretke*, 545 U.S. 231, 237-40, 125 S. Ct. 2317, 2323-25, 162 L. Ed. 2d 196 (2005); *State v. Farmer*, 407 N.W.2d 821, 823 (S.D. 1987) (citing *Batson*, 476 U.S. at 97-98, 106 S. Ct. at 1723-24); *see also Owen,* 2007 S.D. 21, ¶ 45, 729 N.W.2d at 369; *Honomichl v. Leapley*, 498 N.W.2d 636, 638-39 (S.D. 1993).

when she answered the State's one question, and that Juror Laroche had been charged with or investigated for threatening behavior. The first two *Batson* steps were met.

[¶18.] The third step requires the court to determine whether Scott established purposeful discrimination. Indeed, the Supreme Court stated that "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Johnson*, 545 U.S. at 171, 125 S. Ct. at 2418 (quoting *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771). This step is pivotal in the *Batson* evaluation. *Snyder v. Louisiana,* 552 U.S. 472, 477, 128 S. Ct. 1203, 1208, 170 L. Ed. 2d 175 (2008). A court's findings are afforded great deference, as the analysis depends highly on credibility. *United States v. Maxwell*, 473 F.3d 868, 872 (8th Cir. 2007).

[¶19.] In the third step, the *Batson* inquiry cannot be a "farcical ritual," meaning that a trial court should not supinely accept "any purportedly race-neutral reason that a skilled attorney can conjure up in response to a *Batson* challenge," but must decide if the reason offered for the strike was "merely a pretext designed to mask the improper consideration of race to exclude" a juror. *Coombs v. Diguglielmo*, 616 F.3d 255, 261 n.5 (3d Cir. 2010) (citations omitted); *see Miller–El*, 545 U.S. at 251-52, 125 S. Ct. at 2331-32.

[¶20.] But the circuit court here never reached the third step and thus made no findings on whether the State was motivated by discriminatory intent based on all the evidence. Rather, it disposed of Scott's challenge by ruling that "we only

have one person here, . . . not . . . a pattern here. It's just one." In the circuit court's view, the fact that one Native American juror was removed was insufficient, because "there hasn't been a pattern of striking jurors of any certain categories in this."

[¶21.]    A pattern of striking Native Americans is not required for a finding that the State was motivated by purposeful discrimination when it struck *one* Native American prospective juror. *See United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir. 1989). Under *Batson*, the circuit court had the duty to assess the veracity of the State's race-neutral reasons and determine whether Scott met his burden of proving purposeful discrimination. *See Snyder,* 552 U.S. at 477, 128 S. Ct. at 1208.

[¶22.]    Because the circuit court failed to complete its *Batson*-mandated analysis, the question becomes what relief is required. A *Batson* violation usually compels reversal and remand because an unlawful exclusion "'violates a defendant's right to equal protection,' 'unconstitutionally discriminate[s] against the excluded juror,' and 'undermine[s] public confidence in the fairness of our system of justice.'" *Rivera v. Illinois*, 556 U.S. 148, 161, 129 S. Ct. 1446, 1455, 173 L. Ed. 2d 320 (2009) (citation omitted). But on this record, it is unknown whether Juror Laroche was improperly stricken because the court never fulfilled its duty under *Batson*. In these particular circumstances, we agree with those courts that have held that a

limited remand is required to allow the circuit court to engage in the missing analysis.[3]

[¶23.]     We remand to the circuit court to determine if Scott proved that the State was motivated by purposeful discrimination.  The court is directed to make specific findings on the basis for the State's "feeling" toward Juror Laroche and the validity of the State's claim that Juror Laroche had been charged with or investigated for criminal behavior.  If the court finds no racial motivation, the judgment will stand affirmed, subject to Scott's right to appeal this finding.  If the court concludes that Scott proved purposeful discrimination or the court is unable to reach a conclusion because of the passage of time, Scott's conviction should be vacated and a new trial ordered.  *See Rutledge,* 648 F.3d at 562.

[¶24.]     We cannot remand to Circuit Court Judge Thorstenson, who presided here, because she has since left the bench to take another judicial position.  In similar circumstances, other courts have remanded to a new judge to complete the required *Batson* analysis.  *See People v. Davis*, 856 N.E.2d 653, 655 (Ill. App. Ct. 2006).  We are well aware of the "practical difficulties" this may present.  *See State v. Cannon*, 41 P.3d 1153, 1158 (Utah Ct. App. 2002).  If the newly assigned judge

---

3.     *See United States v. McAllister*, 693 F.3d 572, 582 (6th Cir. 2012) (citing *United States v. Torres-Ramos*, 536 F.3d 542, 561 (6th Cir. 2008)); *Madison v. Ala. Dep't of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012); *United States v. Rutledge,* 648 F.3d 555, 562 (7th Cir. 2011); *Diguglielmo*, 616 F.3d at 263; *Galarza v. Keane*, 252 F.3d 630, 640 (2d Cir. 2001); *Reynolds v. Little Rock*, 893 F.2d 1004, 1009 (8th Cir. 1990); *Horsley*, 864 F.2d at 1546; *State v. Nathan*, 992 S.W.2d 908, 915 (Mo. Ct. App. 1999).

determines that insufficient evidence exists to make the necessary findings, then a new trial must be ordered.

### 3. Photographs of Victim's Injuries

[¶25.] Over objection, the circuit court admitted exhibits #2-6, which were photographs taken of Mesteth by Officer Shyne at the scene. Scott argued that they did not show Mesteth's actual injuries and were designed to inflame the jury. What the photos depict is, in a word, gruesome: Mesteth lying on her back, in obvious distress, her face black and blue, extremely swollen, and spattered with blood. One particularly graphic photo shows an up-close view of the blood pooling in her ear and another of a bleeding laceration. In a bench discussion on the record, the court ruled that "they did portray what the witness had described. We had the officer describing it. We also had the last witness, De'Sersa, describing it, and if it will assist in the verbal descriptions of those objects, I find them to be relevant[.]"

[¶26.] "Photographs are admissible '(1) when they portray anything that a witness may describe, and (2) when they assist in a verbal description of objects or conditions *and* are relevant to some material issue.'" *State v. Hart*, 1998 S.D. 93, ¶ 21, 584 N.W.2d 863, 867 (quoting *State v. Muetze*, 368 N.W.2d 575, 586 (S.D. 1985) (citation omitted)).

[¶27.] On appeal, Scott asserts that the court failed to specifically weigh the probative value of the photos against their prejudicial effect. In objecting to the photos on the basis that they were inflammatory, defense counsel properly invoked the balancing test in SDCL 19-12-3 (Rule 403). When photographic evidence is challenged for its prejudicial effect, the court "'must weigh the probative value of

the photographs in resolving a material issue as against the danger of prejudice to the [objecting party] through needless arousals of the passions of the jurors.'" *State v. Woodfork*, 454 N.W.2d 332, 337 (S.D. 1990) (citation omitted).

[¶28.] Nothing in the record indicates that the court specifically weighed the probative value of the photos against their prejudicial effect. Yet Scott directs us to no authority that when admitting or denying photographic evidence a court must conduct the balancing test *on the record*. *See Owen*, 2007 S.D. 21, ¶ 17, 729 N.W.2d at 363. Our precedent requires only an on-the-record balancing test for "other acts evidence." *Id*. And although it would be helpful for appellate review, SDCL 19-12-3 (Rule 403) "does not explicitly require a finding by the trial judge that probative worth is outweighed by countervailing factors." *See* 22A Fed. Prac. & Proc. Evid. § 5224 (2d ed. 2012).

[¶29.] Moreover, Scott directs us to no specific prejudice warranting reversal in admitting the photographs without weighing the probative value against its prejudicial effect. *See Fool Bull*, 2008 S.D. 11, ¶ 10, 745 N.W.2d at 385. He does not dispute the relevancy of the photos. Indeed, they were highly relevant. Scott was charged with causing or attempting to cause "serious bodily injury . . . under circumstances manifesting extreme indifference to the value of human life[.]" SDCL 22-18-1.1(1). These photos surely augment the proof of that charge. They depict Mesteth's condition moments after Scott had brutally beaten her. True, the photos are gruesome, but the charged crime is itself gruesome. Although the circuit court did not articulate the balancing test called for by SDCL 19-12-3 (Rule 403), we are satisfied that the court did not abuse its discretion in admitting the photographs.

#26321

[¶30.] The remaining issues — admitting domestic violence expert testimony, restricting the scope of defense cross-examination of the emergency room nurse, and denying a motion for a judgment of acquittal on insufficiency of the evidence — lack sufficient merit for discussion.

[¶31.] Affirmed in part and remanded for further proceedings.

[¶32.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.