#27462-a-GAS

**2016 S.D. 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

CLEVE ROBERT JANIS, JR.,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER/SHANNON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT A. MANDEL
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

KIRSTEN E. JASPER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                                          and appellee.


JOHN R. MURPHY
Rapid City, South Dakota                    Attorney for defendant
                                                                and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 11, 2016
OPINION FILED **05/18/16**

#27462

SEVERSON, Justice

[¶1.] A jury convicted Cleve Robert Janis, Jr. of third-degree rape (victim incapable of giving consent due to intoxication) on January 14, 2015. Janis appeals his conviction, arguing that the circuit court erred when it admitted undisclosed expert testimony. Janis also argues that the prosecutor committed misconduct through various statements during trial and that there was improper contact between a juror and a spectator. We affirm.

## Background

[¶2.] The jury in this case heard evidence that Janis married Jamie Moreno on August 23, 2013, in Hot Springs, South Dakota. J.E., the victim in this case, was Moreno's maid of honor. After the ceremony, J.E. consumed a large number of alcoholic drinks at the reception. At approximately 1:00 a.m., J.E. received a ride to the home of Janis and Moreno, where she was staying the night. At the time, her speech was quite slurred and she appeared very intoxicated. She did not remember how she made her way to the spare bedroom or how she made it into bed.

[¶3.] About an hour after J.E. left the reception, Janis and Moreno returned to their home. Janis was intoxicated. Wedding guests stated that Janis had consumed a large number of alcohol drinks at the reception. When Janis and Moreno arrived, J.E. was already asleep in the spare bedroom. Janis continued to drink champagne. At some point, he wanted a cigarette and left his bedroom.

[¶4.] J.E. was awakened by someone lying in bed behind her, placing his penis into her anus. She did not know who the person was, asked "who is this?" and followed the question by repeating the words "stop" and "no." J.E. remembered

being somewhat awake, but testified that she was "frozen" during the assault. She recalled passing out again sometime later.

[¶5.] In the morning, J.E. awoke to find Janis in her room, clothed only in his boxers. When he attempted to have sex with her, J.E. rejected his advance and asked him if he knew who had sex with her the night before. He told her that he thought there had been a tall stranger in the house, and that it may have been him. However, Janis did admit to the authorities early in the investigation that he had sex with J.E., but alleged that it was consensual.

[¶6.] Shortly after Janis left her room, J.E. met Moreno in the bathroom and told Moreno what she could remember from the previous night, including the fact that she did not know who had sex with her. Moreno suggested that J.E. report a rape to the authorities and go to the hospital. J.E. testified that she was scared and just wanted to leave town to make it to her new job on time, so she left Hot Springs that morning without going to the police or hospital. However, J.E.'s mother stopped at J.E.'s work later that day and convinced her to report a rape, and J.E. agreed to go to the hospital after work, where a sexual assault examination was performed. J.E. reported the incident to the police five days later.

[¶7.] On December 10, 2013, Janis was charged with third-degree rape. A jury trial was held on January 13 and 14, 2015. The prosecutor at trial was the State's Attorney for Fall River County. Janis's appellate counsel is a different attorney than his trial counsel. Janis's theory at trial was that the sex was consensual. However, the prosecution's theme—beginning with voir dire and culminating in the State's closing argument—focused on broken marriage vows and

character. In voir dire, the prosecutor questioned the potential jurors about wedding vows and how keeping those vows relate to a person's character. This theme of honoring wedding vows recurred throughout the entire trial. He told the jurors, "And when you think of this case, think about those vows and what those vows mean. And those vows are only as good as the character of the person taking those vows."

[¶8.] The prosecutor repeatedly referred to the importance of vows during his cross-examination of Janis and in closing arguments. He began closing argument by stating, "[M]aybe this is what the case is all about, maybe the case is all about those vows are only as strong as the person's character that took those vows. Maybe that's what this case is about." Later in closing he continued, "And this goes to character. This goes to the character of the person that took the vows, and that is essentially what I'm asking you to judge is, I'm asking you to judge Cleve Janis and his character when he took those vows." Finally, he ended in rebuttal argument with, "And what we're talking about is Cleve Janis - and I'm going to finish up with it because we started with it. Those vows are only as good and only as strong as the person and their character taking those vows." The defense did not object to any of these statements made by the prosecutor during trial.

[¶9.] The prosecution's first witness on the second day of trial was J.E. During cross-examination, the defense asked her why she waited to report the crime and whether or not she was truly "frozen" during the incident. After J.E.'s testimony, the prosecutor called Karen Murphy, the Certified Nurse Practitioner

that supervised J.E.'s sexual assault examination. The prosecutor sought her opinion regarding J.E.'s claim that she was "frozen" during the assault. The prosecutor first asked, "Now, in your training in dealing with rape victims, we've had testimony about freezing, frozen, can't move. Is that a normal response when being raped?" The defense objected to this question for lack of foundation, and the trial court sustained the objection. The prosecutor then asked Murphy about her education and training regarding the treatment of rape victims. Murphy stated that she had received generalized training for emergency medicine and mental health that encompassed the treatment of rape victims. The prosecutor then asked:

> Then I'll ask you, based upon your experience, your continuing education, the degree that you've got, the hundreds of—or approximately a hundred rape victims that you've dealt with, based upon all that, have you ever had—based upon all that, is it common or at least does it occur that when a woman is being raped, that she will freeze?

The defense again objected, arguing that there had been no notice of expert testimony for this topic. Through discovery prior to trial, the defense had requested the disclosure of expert witnesses and their opinions, and the prosecution did not identify Murphy's opinion to be that rape victims freeze. The trial court sustained the objection. The prosecutor then followed up with, "Have you ever heard of a woman freezing while she's being raped?" The defense again objected:

> **Defense**: Objection. I don't know if she's going to make the statement in some sort of expert capacity, but I expect that she will, and there's been no notice of that.
>
> **The Court**: Well, we're not talking in expert opinions, so that's overruled at this point. We'll see where it goes.
>
> **Murphy**: Um, yes, um—can you ask me again?
>
> **Prosecutor**: You've experienced it before. Yes?

**Murphy**: I have, yes.  People have different—I mean, they obviously react differently, and it's not uncommon for people not to do anything.

**Prosecutor**: And what did [J.E.] tell you about how she reacted?

**Murphy**: Um, what she told me was that she didn't—she froze. She didn't move.  I didn't go into a lot of detail with [J.E.] because Jessica Sonne was our RN that did the collection and she spent more time obviously asking those questions.  I was— but I did, um, get a brief overview, and she did say that she was—that she didn't fight.  She was not hurt.  She didn't fight, she told me.

[¶10.]     During trial there was also an issue regarding contact between a spectator and a member of the jury.  The defense made the circuit court aware that he had witnessed a spectator speaking with a juror during a recess.  Counsel informed the court of the spectator's name, that the spectator had previously tried to communicate with counsel, and that the bailiff witnessed the contact. Considering the admonishments the court had already given the jury, the circuit court did not wish to question the bailiff, juror, or spectator, as the court thought that more attention to the contact would only be harmful.  However, the court did ask the attorneys if they desired any further action.  Janis's attorney did not object, but just requested a cautionary word to the bailiff.

[¶11.]     Janis appeals his conviction, arguing three issues:

1. Whether the circuit court erred by permitting Karen Murphy to testify as to what she had experienced regarding rape victims.

2. Whether the improper contact between the juror and spectator requires reversal.

3. Whether the prosecutor committed prosecutorial misconduct.

### Analysis

[¶12.]     *1.     Whether the circuit court erred by permitting Murphy to testify as to what she had experienced regarding rape victims.*

[¶13.]     Janis argues that the circuit court erred when it found that Karen Murphy's testimony was not expert testimony. He argues that the testimony was expert testimony requiring disclosure to the defense prior to trial. "We review a [circuit] court's decision to admit or deny an expert's testimony under the abuse of discretion standard." *State v. Johnson*, 2015 S.D. 7, ¶ 30, 860 N.W.2d 235, 247 (quoting *State v. Kvasnicka*, 2013 S.D. 25, ¶ 18, 829 N.W.2d 123, 128). An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Beckwith*, 2015 S.D. 76, ¶ 7, 871 N.W.2d 57, 59.

[¶14.]     SDCL 19-19-701 governs a lay witness's opinion testimony that is not subject to expert disclosure requirements. Under this rule,

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) Rationally based on the witness's perception; (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702.

SDCL 19-19-701. We construe evidentiary rules regarding opinion testimony liberally so as to relax the traditional barriers to opinion testimony. *State v. Condon*, 2007 S.D. 124, ¶ 30, 742 N.W.2d 861, 870.

[¶15.]     The admitted testimony in this case conforms to the requirements of SDCL 19-19-701, and thus did not need to be disclosed prior to trial. Janis argues that the prosecutor expressly asked Murphy to make generalities about rape

victims based on her training, work, and experience rather than her contact with J.E. It is true that the prosecutor asked these questions apparently attempting to lay foundation for inappropriate questions based on expert opinions not disclosed through discovery. However, the circuit court sustained Janis's objections to those questions. The only objection that the court overruled was to the prosecutor's question of: "Have *you ever heard* of a woman freezing while being raped?" (Emphasis added.) Murphy answered, "*I have, yes*. People have different—I mean, they obviously react differently, and it's not uncommon for people not to do anything." (Emphasis added). The admitted answer was based on Murphy's personal perceptions, throughout her career, of rape victims freezing, a response that did not require any specific or specialized knowledge. *See Gerlach v. Ethan Coop Lumber Ass'n*, 478 N.W.2d 828, 831 (S.D. 1991) (holding that testimony analogous to this case did not violate a pretrial motion in limine prohibiting expert testimony where the witness was asked if he or she was personally aware of something and he or she responded affirmatively); *cf. Freedom Wireless, Inc. v. Boston Commc'ns Grp., Inc.*, 369 F. Supp. 2d 155, 157 (D. Mass. 2005) (holding that an opinion from an expert was impermissible only because it was so far removed from the witness's experiences and instead based on his technical knowledge). There is a distinction between the prosecutor's earlier, disallowed questions and the question which Murphy was allowed to answer. The circuit court did not abuse its discretion by allowing Murphy to testify about her own perceptions of rape victims freezing.

[¶16.]     While reversal is not warranted, we do not endorse the prosecutor's approach in this case. His questioning and the record suggest that he was knowingly attempting to elicit expert testimony without prior disclosure. While the circuit court's sustaining of the defense's objections salvaged what could have otherwise merited reversal on appeal, we nonetheless emphasize that the prosecutor's approach was inappropriate.

[¶17.]     *2.     Whether the improper contact between the juror and spectator requires reversal.*

[¶18.]     Even without knowledge of the substance of the conversation, Janis argues that the contact between the juror and the spectator warrants a new trial. Janis argues that a presumption in favor of reversal exists when there is contact between a juror and a spectator and that the presumption can only be rebutted upon questioning the juror about the contact. *See State v. Brown*, 84 S.D. 201, 207, 169 N.W.2d 239, 242 (1969). Janis argues that the presumption remains because the circuit court did not question the juror at all about the contact and the State has failed to rebut it on appeal.

[¶19.]     This argument ignores the fact that at trial, the court asked the parties if they consented to the court's choice to ignore the contact as the court did not wish to emphasize it. Janis's trial counsel fully consented, asking only that the court give an extra warning to the bailiff to be aware of future contact. This clearly distinguishes this case from *Brown,* where the defendant immediately requested a mistrial upon learning of the contact. 84 S.D. 201, 206, 169 N.W.2d at 241. Here, the defense consented to the circuit court's decision to not address the contact with the juror. While the defense may have brought the matter to the attention of the

court, Janis cannot now complain of the court's failure to investigate the contact when Janis declined the opportunity to object or to suggest other courses of conduct. *In re M.S.*, 2014 S.D. 17, ¶ 17 n.4, 845 N.W.2d 366, 371 n.4 ("It is the Court's 'standard policy' that 'failure to argue a point waives it on appeal.'" (quoting *In re Estate of Smid,* 2008 S.D. 82, ¶ 43 n. 15, 756 N.W.2d 1, 15 n. 15)).

[¶20.]    3.    *Whether the prosecutor committed prosecutorial misconduct.*

[¶21.]    Janis next argues that the prosecutor engaged in prosecutorial misconduct through his various comments during the trial. Janis acknowledges that trial counsel did not object to these comments at any point during trial, and thus our review is for plain error. SDCL 23A-44-15. *See State v. Hayes*, 2014 S.D. 72, ¶ 24, 855 N.W.2d 668, 675 (holding that properly objected to instances of prosecutorial misconduct are reviewed for an abuse of discretion, but, "if an issue of prosecutorial misconduct is not properly preserved for appeal, this Court will analyze the claim under plain error"). Plain error merits reversal only when there is an "(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *State v. Nelson,* 1998 S.D. 124, ¶ 8, 587 N.W.2d 439, 443 (quoting *Johnson v. United States,* 520 U.S. 461, 466-67, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997)). Janis has the burden of showing that the plain error resulted in prejudice. *See United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778, 123 L. Ed. 2d 508 (1993). *See also State v. Whitfield*, 2015 S.D. 17, ¶ 16, 862 N.W.2d 133, 139. "We invoke our discretion under the plain error rule cautiously and only in exceptional circumstances." *State*

*v. Olvera,* 2012 S.D. 84, ¶ 9, 824 N.W.2d 112, 115 (quoting *State v. Jones,* 2012 S.D. 7, ¶ 14, 810 N.W.2d 202, 205).[1]

[¶22.]     We have held prosecutorial misconduct to be a "dishonest act or an attempt to persuade the jury by the use of deception or by reprehensible methods." *Hayes,* 2014 S.D. 72, ¶ 23, 855 N.W.2d at 675 (quoting *State v. Lee,* 1999 S.D. 81, ¶ 20, 599 N.W.2d 630, 634). While trial counsel has "considerable latitude in closing arguments," a prosecutor also shares in the court's obligation to ensure that the defendant receives a fair trial. *State v. Smith,* 1999 S.D. 83, ¶ 42, 599 N.W.2d 344, 353. It is not the prosecutor's duty to "seek a conviction at any price." *Id.* "The prosecutor must refrain from injecting unfounded or prejudicial innuendo into the proceedings, and [must] not appeal to the prejudices of the jury." *State v. Janklow,* 2005 S.D. 25, ¶ 47, 693 N.W.2d 685, 700-01 (quoting *State v. Blaine,* 427 N.W.2d 113, 115 (S.D. 1988)). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," but, if the prosecutor's conduct affects the fairness of the trial when viewed in context of the entire proceeding,

---

1.     This fourth component of plain error analysis does not necessarily mean the same thing as "structural error," which is applied to a very limited class of cases and in a criminal trial requires a reversal. The United States Supreme Court has found structural error only when there has been"(1) a deprivation of the right to counsel; (2) a biased judge; (3) an unlawful exclusion of grand jurors of the defendant's race; (4) a deprivation of the right of self-representation at trial; (5) a deprivation of the right to a public trial; and (6) *an erroneous reasonable doubt standard.*" *Hayes,* 2014 S.D. 72, ¶ 17, 855 N.W.2d 668, 674 (quoting *Guthmiller v. Weber*, 2011 S.D. 62, ¶ 16, 804 N.W.2d 400, 406). The Supreme Court also analyzed the distinction in *Johnson v. United States,* 520 U.S. 461, 468, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997). In *Johnson,* the Court stated, "A 'structural' error . . . is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself[.]" *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265, 113 L. Ed. 2d 302 (1991)).

reversal can be warranted. *United States v. Young,* 470 U.S. 1, 11, 105 S. Ct. 1038, 1044, 84 L. Ed. 2d 1 (1985). Appellate courts must "relive the whole trial imaginatively" and not "extract from episodes in isolation abstract questions of evidence and procedure." *Id.* at 16, 105 S. Ct. at 1047 (quoting *Johnson v. United States,* 318 U.S. 189, 202, 63 S. Ct. 549, 555, 87 L. Ed. 704 (1943) (Frankfurter, J., concurring)).

[¶23.]     Under plain error review, we must initially determine if there was error at trial that is plain. Janis first argues that comments made by the prosecutor during voir dire qualify as plain error. Prospective jurors may not be questioned about hypothetical facts to be proved at trial, but may be questioned about their mental attitudes regarding certain types of evidence. *Hayes,* 2014 S.D. 72, ¶ 31, 855 N.W.2d at 678 (quoting *State v. Moeller,* 2000 S.D. 122, ¶ 50, 616 N.W.2d 424, 441). Voir dire is intended for questioning jurors about potential biases. The prosecutor's assertion that Janis raped the maid of honor on Janis's own wedding night could only serve to inflame the jurors' prejudices. It was not phrased as a question to any juror, and thus could not have served to elicit any potential biases. The prosecutor also asked questions regarding what the jurors considered to be signs of intoxication. Such questions were not about their attitudes toward certain types of evidence, but were impermissibly related to the facts of the trial. *See id.* When the prosecutor later referenced the jurors' comments from voir dire in his closing, he brought the jurors' experiences into the trial to an inappropriate degree.

#27462

[¶24.]      The prosecutor's most egregious conduct was his repeated reference to Janis breaking his wedding vows and to Janis's character. These comments culminated in the prosecutor's closing, when he asserted that the case was about Janis's character. The prosecutor inexplicably stated in closing that "[t]his goes to the character of the person that took the vows, and that is essentially what I'm asking you to judge is, *I'm asking you to judge Cleve Janis and his character when he took those vows.*" (Emphasis added.) We have previously disapproved of a prosecutor referring to a defendant's character in closing argument. *Janklow,* 2005 S.D. 25, ¶ 48, 693 N.W.2d at 701 (disapproving of a prosecutor's use of character evidence in the context of prosecutorial misconduct, but affirming the conviction due to a lack of prejudice). *See also* SDCL 19-19-404 (stating that evidence of a person's character is inadmissible to show that a person acted in conformity with that character on a particular occasion). The jury's duty is to determine whether the elements of the charged offense have been met, not to judge the defendant's character. *State v. Lybarger*, 497 N.W.2d 102, 105 (S.D. 1993) ("It is the jury's role to decide whether the elements of an offense have been met."). It does not matter that these comments occurred in the context of the prosecutor's discussion of credibility—to outright declare that the jury's role was to judge the defendant's character is exceedingly inappropriate. Therefore, the prosecutor's comments throughout trial amount to error that is plain.

[¶25.]      While the comments of the prosecutor were improper, Janis must still show that his substantial rights were affected by the error. *See Nelson,* 1998 S.D. 124, ¶ 8, 587 N.W.2d at 443. "Specifically, [the defendant] must demonstrate that

the error affected the outcome of the proceeding." *Hayes,* 2014 S.D. 72, ¶ 37, 855 N.W.2d at 679. While the prosecutor's conduct in this case was exceedingly inappropriate, we note that the circuit court correctly instructed the jury on all of the elements of third-degree rape and the duties of a jury. We must assume that the jury followed these instructions. *Baddou v. Hall,* 2008 S.D. 90, ¶ 37, 756 N.W.2d 554, 563. The elements of third-degree rape were also described by both the defense and prosecution in their closing arguments.

[¶26.] Additionally, this case did not turn on Janis's character but rather on the victim's consent and her level of intoxication. There was evidence that she was "super drunk" and barely able to hold a conversation. She also could not eat without spilling. With respect to consent, Janis concededly lied the morning after the incident when he claimed that he did not have sex with the victim. On the other hand, the victim immediately and consistently asserted that the sex was nonconsensual to her mother, to Moreno, and to the hospital staff. Janis also testified that the victim said to stop and he did. Yet, DNA evidence indicated that Janis proceeded to the point of ejaculation. In light of both testimony and physical evidence supporting conviction, as well as proper jury instructions, Janis has not shown that the outcome would have been different had the prosecutor not engaged in misconduct. He therefore has not met his burden under plain error analysis and is not entitled to a new trial on this issue.

[¶27.] The heavy burden Janis now bears through plain error analysis is due to trial defense counsel's failure to object to any of the inappropriate behavior exhibited by the prosecutor at trial. Had there been an objection that was

overruled, the State would have the burden on appeal to show that the error was harmless under SDCL 23A-44-14, and the result on appeal may have been different. *See Olano*, 507 U.S. at 734, 113 S. Ct. at 1778 (noting the burden change on appeal when defendant objects at trial).

## Conclusion

[¶28.]     The circuit court did not err by admitting Murphy's testimony. The question permitted was rationally based on the witness's perception and was qualified as opinion testimony under SDCL 19-19-701 as distinguished from an expert's opinion under 19-19-702. Additionally, Janis effectively waived his argument regarding the contact between the juror and the spectator by consenting to the circuit court's proposed action and not asking the court to take further action other than cautioning the bailiff. We will not reverse due to the prosecutorial misconduct. The prosecutor's behavior was inappropriate, but Janis has not shown that the result of the trial would have likely been different had the misconduct not occurred. We affirm.

[¶29.]     GILBERTSON, Chief Justice, and ZINTER and WILBUR, Justices, concur.

[¶30.]     KERN, Justice, concurs in part and dissents in part.

KERN, Justice (concurring in part and dissenting in part).

[¶31.]     I concur in the majority opinion's analysis of Issues 1 and 2. As to Issue 3, I agree with the majority opinion's conclusion that the prosecutorial misconduct involved was "exceedingly inappropriate" and constituted plain error.

However, I respectfully disagree that this does not reach the threshold of a federal constitutional violation warranting reversal. In my view, the State's conduct was so improper that it seriously affected the fairness and integrity of the judicial proceedings, depriving Janis of his substantial right to a fair and impartial jury. I would reverse and remand for a new trial.

[¶32.] When analyzing a claim under the plain error standard of review it is necessary to carefully review the claim against the entire record. *United States v. Young*, 470 U.S. 1, 16, 105 S. Ct. 1038, 1046, 84 L. Ed. 2d 1 (1985). Such a review establishes that beginning with voir dire, the State attempted to improperly influence the potential jurors and interject their mental attitudes into the case. The most egregious conduct involved the State's focus on the character of the accused and his unfaithfulness to his wedding vows. "In deciding whether questions exceed the proper scope of voir dire, courts can look to whether they: (1) seek to uncover biases, prejudgments, or prejudices; (2) attempt to ascertain impartiality and qualifications; or (3) undertake to entrap, influence, or obtain a pledge on issues expected to arise in trial." *State v. Scott*, 2013 S.D. 31, ¶ 13, 829 N.W.2d 458, 464.

[¶33.] During voir dire, the State began a discussion regarding the nature of the offense with this statement: "And, um, the facts of this case, the groom raped the bride of honor - - the maid of honor. That is the fact that we have beat around the bush, and I'm not beating around the bush anymore. On the wedding night." But this inflammatory statement by the State was the question to be decided by the jury. A defendant has a right to be tried solely on the basis of the evidence presented to the jury. The risk with this type of remark is that "the prosecutor's

-15-

opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19, 105 S. Ct. at 1048. This tone and tactic pervaded every aspect of the trial.

[¶34.] Next, the State proceeded to elicit from potential jurors the lengths of their marriages receiving answers of 20, 26, 29, 40, 42, and 58 years. The State then inquired about the individual juror's feelings regarding their marriage vows. The State asked a prospective juror who performed marriages, "[f]rom the day you took the vow to every time that you've given the vow, what do they mean to you?" The juror answered that he took the vows very seriously and it involved a matter of personal integrity to him. The colloquy continued:

> **Prosecutor:** Okay. What if you don't mean the words?
>
> **A Juror:** Well, then you're lying.
>
> **Prosecutor:** Okay.
>
> **A Juror:** Right? If you don't mean what you say.
>
> **Prosecutor:** Okay.
>
> **A Juror:** When I do premarital counseling, um, I always emphasize that these are promises you are making to each other, and a promise is only as good as your character.

The State asked other jurors questions such as: "What do your vows mean to you? . . . Any amount of alcohol make you sacrifice them?"; "Is there anything more important than that vow that you took with that man, your husband?"; and "Can you think of anything in your life more important than that day and those vows you

#27462

took?"[2]  This type of inquiry far exceeded the proper purpose and scope of voir

dire—namely, to determine whether the prospective jurors could "set aside

preconceptions and render an impartial verdict."  *State v. Muetze*, 368 N.W.2d 575,

585 (S.D. 1985).  Counsel should be permitted to inquire whether prospective jurors

have preconceived attitudes or biases that would prevent them from following the

---

2.      Counsel for Janis also asked a question of prospective jurors in an improper
        form.  Defense counsel asked:

> Is there anyone here who is a victim of rape --
>         (No response.)
> -- who would rather not talk about it in the presence of everyone
> else?
>         (No response.)
> Seeing no hands, I'll broaden the circle a little bit.  Is there
> anyone here who has a close family member, a sister, a brother,
> a child, niece or nephew who was a victim of rape?
>         (A couple of hands are raised.)

The circuit court then properly gave jurors the opportunity to discuss their
answers in chambers in the presence of the parties.  While defense counsel
inferred the setting could be changed, he posed the initial question in such a
way as to require jurors to publicly disclose whether or not they had been the
victim of rape.  There are several problems with the form of defense counsel's
question.  First, jurors who have been victimized may be unwilling to disclose
this information in a public setting.  If a juror has a bias, which is not
disclosed, a defendant could be deprived of a fair and impartial jury.
Further, requiring a juror to answer this type of question in a public setting
may unnecessarily subject the juror to embarrassment or humiliation.  Jurors
are required to disclose their biases if asked.  But such questions should be
broadly worded to increase the likelihood that jurors provide honest answers
to such personal questions and decrease potential embarrassment.  Then it is
proper, as the circuit court did here, to give jurors the opportunity for
individual voir dire outside the presence of the larger group during which
counsel may inquire and obtain a more detailed answer.  *See Brandborg v.
Lucas*, 891 F. Supp. 352, 357 (E.D. Tex. 1995) (stating "nothing about
becoming a prospective juror amounts to a willing waiver of an expectation of
privacy" as jurors are summoned to the public forum and do not seek it out
themselves).  *See also United States v. Serafini*, 57 F. Supp. 2d 108, 112 (M.D.
Pa. 1999) (noting that jurors' privacy rights are not absolute, but a balance
must be achieved).

law or applying a legal theory or defense. *State v. Iromuanya*, 806 N.W.2d 404, 425 (Neb. 2011). But, the State's questions were designed to improperly influence the jurors' opinions on issues raised during trial, including Janis's credibility. *See id.* (stating "parties may not use voir dire to impanel a jury with a predetermined disposition or to indoctrinate jurors to react favorably to a party's position when presented with particular evidence"); *State v. Hayes*, 2014 S.D. 72, ¶ 35, 855 N.W.2d 668, 679; *State v. Janklow*, 2005 S.D. 25, ¶ 47, 693 N.W.2d 685, 700-01 (noting it is improper for a prosecutor to inject "unfounded or prejudicial innuendo" into trial or to appeal to jury's prejudices); *Scott*, 2013 S.D. 31, ¶ 13, 829 N.W.2d at 464.

[¶35.] The improper references to Janis's character only began with voir dire. Throughout opening statements, questioning, and both closing arguments, the State continued to inject Janis's character into the trial tying it to Janis's infidelity to his wedding vows. The State's comments were not limited to those provided in the majority opinion. In its opening statement, the State directed the jurors, "Now, when you look at this case and you evaluate it, look at the credibility and the trust and the vows." Again, when cross-examining Janis, the State directed the focus to Janis's marriage vows asking, "Those marital vows that you took at Chautauqua Park are only as strong as the character of the person taking those vows. Do you agree with that?" The State also asked Janis, "Okay. So let's talk about your character. Because we talked about your character and what you thought of [your wife] the day after your wedding, but let's walk through the night after the reception."

[¶36.] The State wrapped up its first closing argument by referring to the vows, stating that while the parties agreed J.E. said stop, "Cleve didn't stop. You know what Cleve did? Cleve finished. He finished. And I think that that fact, that fact shows the true character of the man that took the vows that day. That's his character." As noted in the majority opinion, there were further references to Janis's character in the rebuttal closing argument when the State said, "And I think if you focus on the quarter, you focus on the facts, you focus on character, you will convict Cleve Janis."

[¶37.] Closing arguments "should be no more than an accurate summary of the state of the evidence." *State v. Smith*, 1999 S.D. 83, ¶ 48, 599 N.W.2d 344, 354. Attorneys are permitted to "discuss the evidence, pointing out discrepancies and conflicts in the testimony, and argue that the evidence in the record supports and justifies a conviction . . . he or she may make remarks, not based on the record, which concern matters of general knowledge or experience." *Id.* ¶ 46, 599 N.W.2d at 354. The attorney crosses the line, however, upon injecting "unfounded or prejudicial innuendo into the proceedings . . . or appeal[ing] to the prejudices of the jury." *Id.* (quoting *State v. Blaine*, 427 N.W.2d 113, 115 (S.D. 1988)). Unfair statements "invite a jury decision by emotion rather than by evidence." *Id.* ¶ 48, 599 N.W.2d at 354 (finding "[t]he prosecutor's penchant for making statements meant to inflame the passion of the jury and go outside the realm of admissible evidence, is an example of the unprofessional, 'win-at-all costs' attitude that scars the judicial system"). The State's evidence in this case was strong but not overwhelming, rendering the repeated references to Janis's character even more

problematic. This case boiled down to the question whether J.E. was capable of consenting and, if so, did she consent to the sexual act. If J.E. was too intoxicated to consent, the relevant question was whether Janis knew or reasonably should have known J.E. was too incapacitated to consent. Janis testified that J.E. used her hand to guide his penis, pushed back against him, and moaned quietly. He testified that when she said, "No" he stopped the contact. J.E.'s statements were that she was "frozen" by fear, tried to push his hand away, and did not consent. The theme of the defense was that both were drunk and made poor decisions. The defense claimed that because J.E. was embarrassed by what had occurred she reported the act as a rape.

[¶38.] To resolve these issues, the jury was required to evaluate the testimony of Janis and J.E. The only purpose of repeatedly emphasizing Janis's failure to abide by his wedding vows was to show that he was a man of bad character. A man, whose testimony included that J.E. was able to give consent and did consent to the sexual act, should not be believed. This is an impermissible use of character evidence, which is only admissible under carefully prescribed rules. *See* SDCL 19-19-404; SDCL 19-19-607 to 609.[3] It is well established that plain-

---

3. SDCL 19-19-404(a)(1) and -404(b)(1) provide the general rules to which there are enumerated exceptions. SDCL 19-19-404(a)(1) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."

    SCDL 19-19-404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

(continued . . . )

error analysis should be applied cautiously and only in exceptional circumstances. *State v. Beck*, 2010 S.D. 52, ¶ 10, 785 N.W.2d 288, 292-93. This is such a case. Prosecutorial misconduct reaches the level of a federal constitutional violation only if the argument "so infect[s] the trial with unfairness as to make the resulting convictions a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974). While even defense counsel admitted that Janis's conduct was morally reprehensible, Janis is nevertheless entitled to a fair trial. The State's uninterrupted strategy to interject Janis's character into the case from beginning to end so tainted the integrity of the judicial proceedings as to violate Janis's basic right to due process and a fair trial. There is a reasonable probability that but for the statements made by the prosecution, the jury may have acquitted. The conviction should be reversed.

_____

(. . . continued)

SDCL 19-19-608(a) with reference to reputation or opinion evidence provides:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.