#29967-a-JMK
**2024 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

ROBERT A. HORSE,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MATTHEW M. BROWN
Judge

\* \* \* \*

JOHN R. MURPHY
Rapid City, South Dakota                    Attorney for defendant
and appellant.

MARTY J. JACKLEY
Attorney General

STEPHEN G. GEMAR
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
AUGUST 29, 2023
OPINION FILED **01/17/24**

#29967

KERN, Justice

[¶1.]        Robert Horse was convicted of third-degree rape after a four-day trial in Pennington County.  He appeals his conviction, raising issues involving the validity of a search warrant for location data from his phone, comments made during trial by the State about the victim's motivation to testify, and opinion testimony given by the detective who investigated the case.  We affirm.

## Factual and Procedural History

[¶2.]        Fourteen-year-old D.M. was walking alone in Rapid City on Tuesday, June 4, 2019, when a man pulled up next to her in his car.  D.M. recalled the man asking her where he could get some marijuana.  She said that she knew a place and got in the car with him.  The man gave her money to purchase marijuana for him, and they stopped at a house where D.M. knew she could buy some.  After she purchased the marijuana, they stopped at a gas station where the man purchased some rolling papers.  They next drove to Skyline drive in Rapid City where they smoked some of the marijuana.  The man identified himself as "Robert."  They left the Skyline drive area and drove around Rapid City.  At some point, Robert stopped at a gas station where he purchased a case of beer and cigarettes.  According to D.M., as they were driving around, she drank approximately nine beers as well as some Jack Daniels and smoked some of the marijuana.  D.M. recalled stopping at a gas station in Deadwood but blacked out after that, and her memory became spotty thereafter.

[¶3.]        D.M.'s next memory was Horse's face directly in front of hers.  She explained that he was on top of her with his face about a foot or two away while she

-1-

was lying on her back. She next remembered standing in the shower of a "very nice" bathroom, which she thought might have been in a hotel. Her next recollection was being at a Dairy Queen and then trying to get into a car, but she did not know how she had arrived there. The next thing she remembered was waking up in her own bed in her room. She did not recall having sex with Horse. However, when she got out of bed, she noticed "white stuff" in her panties. These events all occurred on Tuesday.

[¶4.] D.M. did not disclose these events to anyone until Wednesday when she told her mother. Her mother indicated that she would take her to the hospital Thursday after work. However, D.M. instead went to a friend's house on Thursday, got drunk, and went to a weekly summer gathering in downtown Rapid City, where D.M.'s mother and stepfather eventually found her and attempted to bring her home. An altercation ensued and D.M. was taken into custody for assaulting her stepfather. She was taken to the ARISE[1] facility where during the intake process and screening she told the staff that she might have been sexually assaulted. The ARISE staff took her to the hospital where a rape kit was performed. D.M. was interviewed by law enforcement and detailed the information that she could remember from her time with Horse.

[¶5.] In an attempt to identify the man D.M. referred to as Robert, Detective Trista Dupres of the Pennington County Sheriff's Office obtained a surveillance

---

1.  The ARISE Center is located at the Western South Dakota Juvenile Services Center. It is a staff secure, detention alternative/emergency shelter for youth between the ages of 10 and 17 serving Pennington, Meade, Lawrence, Fall River and surrounding counties.

video from the gas station where, according to D.M., they had bought beer and alcohol. Detective Dupres took a still photo from the video which depicted a man getting out of the car D.M. was travelling in. She sent this photo to local law enforcement asking for assistance in identifying the suspect. Horse was first identified by Rapid City Police Chief Karl Jegeris, who recognized Horse from the photo. Horse's parole officer confirmed Horse's identity and D.M. identified Horse from a photo lineup.

[¶6.]    Horse was arrested on June 26, 2019, and taken to the Pennington County Jail and charged by complaint with alternative counts of rape. Sometime thereafter, law enforcement received the test results from the rape kit which revealed that the DNA identified in the sperm cell fraction obtained from D.M.'s vaginal area matched a known sample taken from Horse. As part of her investigation, Detective Dupres applied for and received a search warrant on June 27 (2019 warrant) for Horse's Samsung Galaxy S7 cell phone. The phone was taken with Horse's property at the jail incident to his arrest.[2] On July 10, 2019, Horse was indicted on one count of third-degree rape in violation of SDCL 22-22-1(4) and in the alternative, one count of fourth-degree rape in violation of SDCL 22-22-1(5).

[¶7.]    To prove that the crime occurred in Pennington County and to verify D.M.'s recollection of events, the State sought to introduce location data obtained from Google to show where Horse's cell phone had been on the day of the alleged

---

2.    Even after obtaining the June 2019 warrant, law enforcement was initially unable to unlock the phone to obtain any information without a passcode. However, law enforcement acquired the passcode through listening to a phone call Horse made at the jail.

crime. Although not contained in the record, two warrants were apparently issued to Google in January and February of 2020 to obtain the location data.[3] The warrants were discussed at a pretrial *Daubert* hearing where Horse moved via an oral motion to suppress the historical cell site location data relied upon by the State's expert witness, Agent Richard Fennern of the Federal Bureau of Investigation. In ruling on the suppression motion, the circuit court described the warrants as listing the physical location of Google, Inc. and the account of Robert Horse along with a specific email account attributed to him. The court further stated that the warrant authorized a search for "all location data, whether derived from local positioning system, GPS data, cell sites or tower triangulation or trilateration, precision measurement information such as timing, advanced or per call measurement data, and Wi-Fi location. Such data shall include the GPS coordinates and date and time of all location readings for June 4th of 2019." The court denied the motion to suppress the location data and permitted Agent Fennern to testify at trial.

[¶8.]     At trial, the State called twenty witnesses. D.M. testified about her memory of the events surrounding the incident. The State showed her several photos of the bathroom taken at the house where Horse had been staying at a home on East Enchanted Pines Drive. D.M. testified about various aspects of the bathroom that she recognized from the photos.

---

3.     At the *Daubert* hearing, the State indicated that there was an issue with the time frame listed on the first warrant, resulting in a request for a second warrant.

[¶9.]    At the end of D.M.'s direct examination, the following exchange

occurred:

| | |
|---|---|
| State: | [D.M.], why are you here today? |
| Defense Counsel: | I'm going to object to relevance. Rule 403. |
| Court: | I will sustain the objection. |
| State: | [D.M.], is it easy for you to be here today? |
| D.M.: | No. |
| State: | Okay. What made you decide to come and testify today? |
| Defense Counsel: | I'm going to object to that as – the same objection, Rule 401, Rule 403. |
| Court: | It's a little bit more specific of a question. I will overrule the objection, and you can answer that question. |
| D.M.: | Maybe I will save someone else. |
| State: | Okay. Thank you. I have no further questions. |
| Defense Counsel: | What was the answer. I didn't even hear that answer. |
| D.M.: | Maybe I will save somebody else. |
| Defense Counsel: | I'm going to object to that. I'm going to ask that it be stricken, Your Honor. That's speculation and conjecture, and there is – there is no basis for that. |
| State: | I object to the speaking objection. And maybe it's the truth. |
| Defense Counsel: | I'm going to object, Your Honor, and ask that that be stricken and the jury be instructed to disregard it. |

At that point, the court took a recess. Outside the presence of the jury, Horse made

a motion for a mistrial based on the State's comment "And maybe it's the truth."

After hearing arguments from the parties, the court overruled the objection to

D.M.'s response to the question regarding why she chose to testify. The court

explained that D.M.'s motivation for testifying was likely to be called into question

on cross-examination and throughout the trial. Observing that although the State's

question was likely more appropriate on redirect examination, the circuit court allowed the question and answer to stand.

[¶10.] As for the State's superfluous statement, the court determined that it was argumentative, and therefore inappropriate at that stage of the trial. The court admonished the State and indicated that it would give a curative instruction to remedy the situation. The court denied the motion for mistrial concluding there was not sufficient prejudice to the defendant to warrant a mistrial.

[¶11.] After the recess, the court reread a preliminary instruction given to the jury emphasizing that statements and arguments by the attorneys during the trial were not evidence, and also that the jury should not be influenced by the objections made by the lawyers. The court struck the particular statement made by the prosecutor from the record and told the jury to disregard it.[4]

[¶12.] Detective Dupres also testified at trial about her investigative efforts in the case. She indicated that she had obtained a search warrant for Horse's phone and gave the phone to a forensic examiner in order to download the contents of the phone. She explained that she had also obtained additional warrants for Horse's Google account in an attempt to gather location data to determine where Horse and D.M. travelled on the day in question. Her objective for obtaining this information was to determine in which county the crime occurred. She stated that she received an Excel spreadsheet from Google containing a series of latitudinal and longitudinal

---

4. In striking the statement, the court advised the jury that the prosecutor's comment "maybe it's the truth," "has been stricken from the record, and I am admonishing the [j]ury to disregard that argument and that statement from your consideration in the trial."

coordinates. She delivered this information to the FBI for assistance in mapping out the location of the phone during the time frame involved.

[¶13.] Agent Fennern testified that he was a member of the FBI's cellular analysis survey team, comprised of agents who receive extensive training on cellular technology and location information. In collaboration with local agencies, team members assist with investigations by using historical data and records to determine the location of phones, fugitives, and missing persons. Agent Fennern testified that he received the Google location data and prepared a report based on that information, which was admitted as an exhibit at trial. He described the data as containing approximate locations of the device based on interactions with GPS,[5] wi-fi access points, and cellular networks that provide a radius within which a phone is located. Agent Fennern testified that of the various types of data analyzed, the GPS data is the most precise, with wi-fi data covering a larger radius, and cell data having the broadest radius.

[¶14.] Using the information acquired from the data points of these three sources, Agent Fennern testified that the data showed that the cell phone in question had been in the area of the East Enchanted Pines Drive address D.M. described on June 4, 2019, from 10:00 a.m. until 10:53 a.m. At 10:53 a.m., the phone started moving into Rapid City. Agent Fennern testified that the location information was consistent with the phone being at an Exxon gas station from 11:33 a.m. until 11:35 a.m. and at a Corner Pantry gas station from 11:39 a.m. until 11:43

---

5.    Agent Fennern testified that most cell phones contain a GPS radio. The GPS receivers in the phone connect with a satellite to determine the location of the phone.

a.m. From 1:51 p.m. until 3:19 p.m., the location data showed the phone leaving Rapid City and going north to Sturgis before traveling toward Deadwood. The data revealed that the phone moved back to Rapid City from Deadwood between 3:20 p.m. and 4:26 p.m. Agent Fennern testified that the phone was back in the immediate vicinity of the East Enchanted Pines Drive address from 4:26 p.m. to 5:30 p.m. Finally, Agent Fennern testified that the phone was located in the immediate vicinity of a Dairy Queen from 8:24 p.m. until 8:45 p.m. and then returned to the East Enchanted Pines Drive address at 10:49 p.m.

[¶15.] Detective Dupres was recalled to the witness stand, and toward the end of her direct examination, the State asked whether, based on her investigation, she had an opinion as to where the assault took place. Horse objected as to lack of foundation and invading the province of the jury, which the court overruled. Detective Dupres indicated that she believed the assault occurred at the East Enchanted Pines Drive address, located within Pennington County. This opinion was based on the report from the FBI as well as what D.M. had told her regarding the pictures of the bathroom in Horse's residence.

[¶16.] The jury convicted Horse of third-degree rape on September 14, 2021, and the court ordered a presentence investigation and a psycho-sexual examination. At the sentencing hearing held on March 24, 2022, the circuit court sentenced Horse to serve twenty years in the penitentiary, consecutive to a sentence he was already serving. Horse appeals, raising several issues which we restate as follows:

> 1.      Whether there was probable cause to authorize the search warrant for the Google location data.

2. Whether the circuit court abused its discretion by overruling Horse's objection to the State's question regarding D.M.'s motive for testifying and in denying Horse's motion for a mistrial based on the State's comment.

3. Whether the circuit court abused its discretion in permitting Detective Dupres to opine about the location of the crime.

## Analysis

### 1. *Whether there was probable cause to authorize the search warrant for the Google location data.*

[¶17.] Horse first argues that the circuit court should have granted his motion to suppress the location data relied upon by Agent Fennern. He alleges that there was a lack of probable cause to support the search warrant in that the search warrant lacked sufficient particularity as to the information sought. We review the issuing court's determination of probable cause with "great deference," and we "are not empowered to conduct an after-the-fact de novo probable cause determination[.]" *State v. Ostby*, 2020 S.D. 61, ¶ 13, 951 N.W.2d 294, 298 (quoting *State v. Raveydts*, 2004 S.D. 134, ¶ 8, 691 N.W.2d 290, 293).

[¶18.] "In determining whether probable cause exists to support the issuance of a search warrant, '[t]here must be "a showing of probability of criminal activity."'" *Id.* ¶ 14, 951 N.W.2d at 299 (alteration in original) (quoting *State v. Tenold*, 2019 S.D. 66, ¶ 30, 937 N.W.2d 6, 14). A probability of criminal activity is analyzed "by looking at the totality of the circumstances to decide if there was at least a 'substantial basis' for the issuing judge's finding of probable cause." *Raveydts*, 2004 S.D. 134, ¶ 7, 691 N.W.2d at 293 (quoting *State v. Jackson*, 2000 S.D. 113, ¶ 8, 616 N.W.2d 412, 416). However, "[o]n review, we are limited to an examination of the

facts as contained within the four corners of the affidavit." *Ostby*, 2020 S.D. 61, ¶ 13, 951 N.W.2d at 298 (quoting *State v. Gilmore*, 2009 S.D. 11, ¶ 7, 762 N.W.2d 637, 641). Furthermore, we "look at the evidence contained in the affidavit in its entirety—the 'whole picture'—rather than at each piece of the evidence in isolation." *Id.* ¶ 15, 951 N.W.2d at 299 (quoting *State v. Barry*, 2018 S.D. 29, ¶ 22, 910 N.W.2d 204, 212).

[¶19.] In his argument to this Court, Horse argues that the June 2019 search warrant for his cell phone was overly broad, not based on probable cause, and not sufficiently particular. In support of his argument that the location data should be suppressed, he challenges the June 2019 warrant. But the location data used by Agent Fennern was produced from the January and February 2020 search warrants presented to Google, not from the June 2019 warrant. Agent Fennern testified that he relied on the location data obtained from Google for his analysis, not on the information from the cell phone itself.[6] In other words, law enforcement did not need the cell phone in order to obtain this location data. Therefore, the June 2019 search warrant was not relevant to the analysis, and we decline to address this claim.

---

6.  In his reply brief, Horse contends that the GPS data came from within the cell phone itself. However, Agent Fennern testified that all of the information he relied upon including GPS, wi-fi, and cellular data came from the Google location data. During the *Daubert* hearing, Agent Fennern explained that in order to obtain the location data from Google, it was necessary to provide the phone identifier (the serial number of the cell phone, also known as the International Mobile Equipment Identifier) or a Gmail account and not the physical phone itself.

[¶20.]     In regard to the remaining two warrants from January and February 2020, they are not contained in the record for our review.  We may only "review the trial court record insofar as it exists."  *Graff v. Child.'s Care Hosp. & Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489.  "[T]he ultimate responsibility for presenting an adequate record on appeal falls upon the appellant."  *Strong v. Gant*, 2014 S.D. 8, ¶ 23, 843 N.W.2d 357, 363 (quoting *Toben v. Jeske*, 2006 S.D. 57, ¶ 11, 718 N.W.2d 32, 35).  "Where the trial court record is incomplete and not adequate to the task, 'our presumption is that the circuit court acted properly.'"  *Graff*, 2020 S.D. 26, ¶ 16, 943 N.W.2d at 489 (quoting *Baltodano v. N. Cent. Health Servs., Inc.*, 508 N.W.2d 892, 895 (S.D. 1993)).  We therefore assume that the January and February 2020 search warrants were properly granted.

> **2.     *Whether the circuit court abused its discretion by overruling Horse's objection to the State's question and denying Horse's motion for mistrial.***

[¶21.]     Horse next alleges that the State's question to D.M.— "What made you decide to come and testify today?"—was irrelevant and elicited a response which had the sole purpose of appealing to the sympathy of the jury.  "Our standard of review for evidentiary rulings 'requires a two-step process: first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was . . . prejudicial[.]'"  *State v. Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d 21, 30 (quoting *State v. Thoman*, 2021 S.D. 10, ¶ 41, 955 N.W.2d 759, 772).  "An abuse of discretion is a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence."  *Id.* ¶ 21 (quoting *State v.*

*Babcock*, 2020 S.D. 71, ¶ 21, 952 N.W.2d 750, 757). In addition to a showing of error, the appellant must also show prejudice before we will reverse. *Id.* ¶ 20.

[¶22.] Horse claims that the question and answer about D.M.'s motive to testify was irrelevant and highly prejudicial as D.M.'s credibility and her motivation to testify had not yet been attacked on cross-examination. We agree with the circuit court that the question may have been better suited for redirect examination to rehabilitate D.M. after her credibility was challenged through cross-examination. However, D.M.'s motive to testify was not irrelevant. Notably, defense counsel had advised the jury in his opening statement that this case would come down to the credibility of D.M., and he also alluded to what might have motivated her to report that she had been sexually assaulted. Under these circumstances, the circuit court was acting within its discretion in allowing the question and we find no error.

[¶23.] Closely related to the previous issue is Horse's contention that the prosecutor's statement of "And maybe it's the truth" regarding D.M.'s answer about her motivation to testify at trial should have been grounds for a mistrial, as the impermissible comment amounted to prosecutorial misconduct that improperly bolstered the witness's credibility. "We review the denial of a motion for mistrial for an abuse of discretion[.]" *State v. Shibly*, 2023 S.D. 30, ¶ 21, 993 N.W.2d 143, 150 (alteration in original) (quoting *State v. Nelson*, 2022 S.D. 12, ¶ 35, 970 N.W.2d 814, 826).

[¶24.] "Improper vouching 'invite[s] the jury to rely on the government's assessment that the witness is testifying truthfully.'" *State v. Manning*, 2023 S.D. 7, ¶ 38, 985 N.W.2d 743, 755 (alteration in original) (quoting *State v. Snodgrass*,

2020 S.D. 66, ¶ 45, 951 N.W.2d 792, 806). "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." *Hankins*, 2022 S.D. 67, ¶ 32, 982 N.W.2d at 33 (quoting *State v. Hayes*, 2014 S.D. 72, ¶ 23, 855 N.W.2d 668, 675). "[N]o hard and fast rules exist which state with certainty when prosecutorial misconduct reaches a level of prejudicial error which demands reversal of the conviction and a new trial; each case must be decided on its own facts." *Id.* ¶ 33 (alteration in original) (quoting *State v. McMillen*, 2019 S.D. 40, ¶ 27, 931 N.W.2d 725, 733). "Prosecutorial misconduct is prejudicial when it 'so infect[s] the trial with unfairness as to make the resulting convictions a denial of due process.'" *Id.* (alteration in original) (quoting *State v. Smith*, 1999 S.D. 83, ¶ 52, 599 N.W.2d 344, 355). "'A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone,' but, if the prosecutor's conduct affects the fairness of the trial when viewed in context of the entire proceeding, reversal can be warranted." *Id.* (quoting *McMillen*, 2019 S.D. 40, ¶ 27, 931 N.W.2d at 733).

[¶25.] Here, the statement by the prosecutor does not require reversal. The prosecutor's remark, while improper, was not so reprehensible that it "infected the trial with unfairness" so as to require reversal. The comment was a very short statement made in the course of responding to a specific objection by defense counsel regarding the speculative nature of the witness's statement. And fairly read, the prosecutor did not state that D.M. had, in fact, told the truth; the prosecutor said that "maybe it's the truth." Regardless, the circuit court took appropriate curative action by striking the comment from the record and by

-13-

reiterating the preliminary instruction given to the jury that comments and objections made by the attorneys are not evidence that should be considered. Further, Horse has not shown that this statement, made in the course of a four-day trial, was prejudicial to him. Therefore, the circuit court did not abuse its discretion in denying Horse's motion for a mistrial.

### 3. Whether the circuit court abused its discretion in permitting Detective Dupres to opine about the location of the crime.

[¶26.] Finally, Horse asserts that Detective Dupres's opinion as to where the rape occurred was not a lay opinion, but rather an expert opinion that should have been disclosed prior to trial, pursuant to a pretrial order requiring disclosure of experts and their anticipated testimony.

[¶27.] "Decisions to admit or deny opinion evidence will not be reversed unless there is a clear showing of an abuse of discretion." *State v. Moran*, 2003 S.D. 14, ¶ 12, 657 N.W.2d 319, 324. Lay witness testimony is governed by SDCL 19-19-701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) Rationally based on the witness's perception;
> (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702.

[¶28.] Here, Detective Dupres's opinion was not an expert opinion. Her testimony regarding the location in which the crime occurred was rationally based on her perceptions of the case having served as the lead investigator. This Court has determined in prior cases that law enforcement officers may testify as lay

-14-

witnesses based upon their own observations and involvement with the case. *See, e.g.*, *State v. Evans*, 2021 S.D. 12, ¶ 56, 956 N.W.2d 68, 89; *State v. Stone*, 2019 S.D. 18, ¶ 32, 925 N.W.2d 488, 499; *State v. Asmussen*, 2006 S.D. 37, ¶ 40, 713 N.W.2d 580, 592. Detective Dupres was simply connecting the dots between information gleaned from the overall investigation, namely, her knowledge of the Google location data provided by Agent Fennern charting the route taken by Horse and D.M., and D.M.'s statements that she recognized the bathroom in Horse's home from photographs shown to her by law enforcement. Detective Dupres's opinion was not based on "scientific, technical, or other specialized knowledge," as defined in SDCL 19-19-702.

[¶29.] Horse also alleges that Detective Dupres's testimony invaded the province of the jury on the issue of venue. Detective Dupres gave her opinion regarding where the crime occurred, and the jury was entitled to give that opinion whatever weight they deemed appropriate. Indeed, the jury was properly instructed that it was their role to determine that the State had established venue by a preponderance of the evidence, which was defined in a separate instruction.[7]

---

7. The instruction read:

> The indictment alleges that offenses for which Defendant stands charged were committed in Pennington County. This place of commission of a crime is called venue. Venue must be shown by the evidence which the State has the burden of proving by a preponderance of the evidence. If the State does not prove venue by a preponderance of the evidence, you must acquit the Defendant.

(continued . . .)

Therefore, Detective Dupres's opinion as to where the crime occurred was a lay opinion and the circuit court did not abuse its discretion by admitting the evidence.

## Conclusion

[¶30.]     The location data was obtained by the January and February 2020 search warrants and because these warrants are not included in the record, we presume the warrants were proper and the circuit court did not err in its probable cause determinations.  Further, the court did not abuse its discretion in denying Horse's motion for a mistrial because the prosecutor's comment did not rise to the level of prosecutorial misconduct.  Finally, the court did not abuse its discretion by admitting Detective Dupres's opinion as to where the rape took place because such testimony did not constitute previously undisclosed expert testimony.

[¶31.]     JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.

---

(. . . continued)

> When a Crime is committed in one county and partly in another county, or the acts requisite to the offense occur in two or more counties, the venue of the crime is in either county.

This instruction adequately instructed the jury that the State was required to prove venue.