#30720-a-PJD
**2025 S.D. 27**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

NATHAN LEE PARRIS,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JANE WIPF PFEIFLE
Retired Judge

* * * *

ERIC DAVIS
NATHANIEL NELSON of
Nelson Law
Sturgis, South Dakota                    Attorneys for defendant and
                                         appellant.


MARTY J. JACKLEY
Attorney General

JACOB DEMPSEY
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                         appellee.

* * * *

ARGUED
JANUARY 14, 2025
OPINION FILED **06/11/25**

#30720

DEVANEY, Justice

[¶1.] Law enforcement took Nathan Parris into protective custody and placed him on a mental health hold after determining, based on his suicidal statements and other actions, that emergency intervention was necessary. Prior to placing Parris in the police vehicle for transport to the hospital for a mental health evaluation, officers searched him and retrieved a small, closed container from his pocket. They opened the container and discovered it contained methamphetamine. Parris was later charged with possession of a controlled substance. The circuit court denied Parris's motion to suppress the drug evidence. Parris appeals his conviction for possession of a controlled substance, claiming the court erred in denying his suppression motion. We affirm.

## Factual and Procedural Background

[¶2.] On June 28, 2022, at approximately 9:00 p.m., Officers Trae Hood and Cody McCracken of the Rapid City Police Department responded to a report of a possible suicidal subject. This was prompted by a call from a woman, identified as Grace, who lived out of state and requested that the officers check the welfare of 24-year-old Nathan Parris of Rapid City. Grace identified Parris as her boyfriend and explained she was concerned because that evening Parris had sent text messages to her and to his father that were suicidal in nature. She told the officers that Parris was having a hard time and that he "keeps saying he's going to kill himself." According to Grace, this was out of character for Parris. Grace said in one of the last communications from Parris, he told her he loved her. When she tried calling him, he texted her and asked her to stop calling. She relayed that Parris was not

-1-

answering her, his mother, or anyone else. She said Parris owned a handgun and she believed he might have it with him.

[¶3.] The officers arrived at the residence where Parris lived with his mother and stepfather. Both were outside and Mother had been talking on the phone with Grace. They told the officers Parris was not home and they did not know where he was. The last time they saw him was about two hours earlier at the residence, where he was talking on the phone with someone named Eric and having an argument about a dog. Mother said at that time, she and Stepfather left to go to a baseball game that Parris was also planning to attend, but he did not show. When they got home, Parris and his dog were gone, as well as the pickup truck that he drove. A tracking device that was usually in the pickup had been removed and was left behind.

[¶4.] Mother showed the officers a text that Parris had sent to his father, Rob, that evening, which had been forwarded to her. Rob was her ex-husband who lived in Wyoming. The text stated, "Your truck will be in the Hills with me and my dog if we are found. I'm fucking done with life." Mother told the officers that Parris had also sent Grace a text that said, "Don't waste your time, I'm not worth it." According to Mother, Parris had never made suicidal threats before, but he had recently been under a lot of stress. She told the officers that Parris owned a handgun and likely had it with him.

[¶5.] After obtaining information describing Parris, his pickup, and his cellphone number, Officer Hood went to his patrol vehicle and entered the information into a national database for missing or endangered persons. He also

had Parris's cell phone pinged to try to determine his location, but this proved to be unsuccessful. Meanwhile, Stepfather went to Parris's bedroom to look for the handgun and confirmed to the officers that it was gone. Only an empty case and gun holster were found in the room.

[¶6.]     Throughout this timeframe, the officers remained on scene, either in the garage or in the patrol vehicle, as they gathered information and attempted to locate Parris. Mother continued to make multiple attempts to reach her son and asked him to come home. She eventually spoke to him on the phone and he agreed to return to the residence. When Parris arrived in the pickup, Mother went to talk to him as Officers Hood and McCracken waited in the garage. After a short time, Parris walked into the garage and the officers observed that he had a handgun hanging out of his shorts pocket with no holster. As Officer McCracken performed a cursory pat-down of Parris's clothing, Officer Hood retrieved the gun and handed it to another officer who had just arrived, Officer Kaleigh Crumb. The gun contained a loaded magazine. Nothing else was retrieved from Parris at that time.

[¶7.]     Parris agreed to talk with the officers as Mother and Stepfather stood nearby. When Officer Hood inquired what was going on, Parris said he was upset with how people had been treating him, particularly his father. He stated he was supposed to get a puppy but just learned he would not and said his father had been lying to him about the situation the last couple weeks. He explained that his frustration was about more than just puppies but rather, "[i]t's the way he's treated me my whole life." Parris described several incidents involving his father that led to his frustration. He told the officers, "I really just wanted him to feel like shit"

and "I just wanted him to feel the way I was feeling[.]" He continued, "I wanted mostly to make a point to him. I never actually wanted to kill myself. But it's just very frustrating feeling like I wasn't loved by my own father."

[¶8.] When asked why he sent the text to Grace, Parris explained that she had broken up with him six months prior but continued to talk to him and visit, even though he wanted to sever their relationship. He relayed that he felt like no one respected him or what he had to say. He further described how he had recently injured his finger and was unable to work at his job.

[¶9.] Officer Hood then asked, "So tonight was just kind of a pile up?" and Parris responded, "Yeah, the last twenty-four years of my life[.]" Throughout the conversation, Parris's demeanor was subdued and his emotional distress was evident. He occasionally got choked up and teary-eyed. He acknowledged he was "worked up" and "real upset the last couple days," and had "a lot of other stuff going on." When asked whether he had considered talking to someone about it, Parris admitted he had thought about it, but had not taken steps to do so. Officer Hood asked him if he would be willing to talk to someone that night. Parris declined but offered to take a phone number and schedule an appointment. At that point, Officer Hood told him they were going to get him some help and "take [him] in and get [him] someone to talk to." When Parris claimed that was not needed, the officer reminded him of the statements he had made. Parris replied that he was only trying "to get them to understand how [he] was feeling" and that he "wouldn't actually do it." He explained, "I was trying to get her to leave me alone, and I wanted my dad to understand how I felt."

[¶10.] Officer Hood told Parris they were going to take him into custody on a mental health hold. At first Parris resisted the officers as they attempted to handcuff him but eventually, he stopped struggling. Before Parris was put into the vehicle to be transported to the hospital, the officers searched him and removed items from his pockets. This included a small plastic closed container that Officer Hood temporarily placed on the top of the patrol vehicle. Parris was then seated in the patrol vehicle and buckled in. Officer Hood spent several minutes talking with Mother, explaining what would happen next with the mental health hold and that Parris would be evaluated by a qualified mental health professional.

[¶11.] While Officer Hood was speaking to Mother, Officer Crumb opened the plastic container and discovered a clear plastic bag containing a white crystalline substance that field-tested positive for methamphetamine.[1] Parris was then transported to the hospital for the emergency mental health hold.

[¶12.] In August 2022, Parris was indicted on one count of possession of a controlled substance. He moved to suppress the drug evidence, arguing that law enforcement did not have probable cause to take him into protective custody for the emergency mental health hold. Later, at a pretrial motion hearing, Parris clarified that, with respect to the search, he was not challenging the validity of the pat-down conducted before he was transported to the hospital nor the resulting removal of the items from his pockets. He acknowledged that a search was permissible under *Cordell v. Weber*, 2003 S.D. 143, 673 N.W.2d 49. However, he claimed that the

---

1. The substance was later confirmed by a police department forensic chemist to be methamphetamine.

subsequent opening of the closed plastic container found in his pocket was an impermissible search in violation of the Fourth Amendment to the United States Constitution and Article V, Section 11 of the South Dakota Constitution.

[¶13.] At the hearing, Officer Hood testified and his body-camera video from the night of June 28 was received as an exhibit. He explained that he took Parris into protective custody on the mental health hold because he believed Parris was a danger to himself based on the totality of the events that evening. This included Parris's suicidal statements, the fact he removed the tracker from the pickup to make it harder to locate, and that he had his firearm that night and was carrying it in an unusual way without its holster.

[¶14.] Regarding the search of Parris's pockets prior to the transport to the hospital, Officer Hood testified it was necessary to ensure Parris had no contraband or possible weapon or dangerous item that could harm law enforcement or others at the facility. The officers did not expand their search to include Parris's vehicle or the home. Officer Hood testified the plastic container was large enough to have held something like a razor blade and he was aware that contraband could be hidden in any type of container. When asked by defense counsel why it was still necessary to open the plastic container after it was already removed from Parris's possession, Officer Hood explained that law enforcement needed to check it before it was allowed into the secure healthcare facility. He confirmed it was his intention that the container would go to the facility along with Parris's other items, because any property goes with the subject unless they specifically request that something be left. In fact, Parris had made such a request regarding a dog collar transmitter

that was hanging around his neck, which the officers removed and left at the residence. Other property of Parris's, including his cell phone, did go to the facility.

[¶15.] At the conclusion of the hearing, the circuit court orally denied the motion to suppress. The court determined that probable cause existed to support the officers' belief that Parris was severely mentally ill and intended to harm himself, and that an emergency intervention was necessary. The court further ruled that the search of the plastic container was permitted under *Cordell* as a noninvestigatory administrative search necessary to protect Parris, the officers, and the facility. The court later entered a written order denying the motion. Thereafter, a court trial was held on stipulated facts and the court found Parris guilty of possession of a controlled substance. The court imposed a suspended sentence and probation.

[¶16.] On appeal Parris raises the following issues, which we have restated:

1. Whether the circuit court erred when it determined that law enforcement officers had probable cause to take Parris into protective custody.

2. Whether law enforcement's search of a closed container removed from Parris's pocket when he was taken into protective custody was permissible.

**Standard of Review**

[¶17.] "We review the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review." *State v. Edwards*, 2024 S.D. 62, ¶ 14, 13 N.W.3d 199, 202 (citations omitted). "However, we review any underlying factual findings of the

circuit court under the clearly erroneous standard." *Id.* (citations omitted) (cleaned up).

## Analysis and Decision

### 1. Whether the circuit court erred when it determined that law enforcement officers had probable cause to take Parris into protective custody.

[¶18.] Before analyzing the validity of the search of Parris, we must first determine whether there was an appropriate basis for the officers to take him into protective custody. SDCL chapter 27A-10 governs emergency mental illness holds. Under SDCL 27A-10-3, "[a] peace officer may apprehend any person that he has probable cause to believe requires emergency intervention under the criteria in § 27A-10-1." The referenced statute, which governs the form and content of a petition for emergency commitment, states that a petition may be submitted if the "person is alleged to be severely mentally ill and in such condition that immediate intervention is necessary for the protection from physical harm to self or others . . . ." SDCL 27A-10-1. If the officer has probable cause to believe emergency intervention is necessary, then the "officer shall transport the person to an appropriate regional facility" where the person will be evaluated by a qualified mental health professional. SDCL 27A-10-3, 27A-10-6.

[¶19.] Thus, as expressed in SDCL 27A-10-3, the applicable standard governing the officers' decision to take Parris into protective custody for purposes of a mental health evaluation under the emergency mental illness hold statutes is probable cause. We review a circuit court's probable cause determination under a

de novo standard.[2] *State v. Smith*, 2014 S.D. 50, ¶ 14, 851 N.W.2d 719, 724; *State v. Hirning*, 1999 S.D. 53, ¶ 9, 592 N.W.2d 600, 603 (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

[¶20.]     When assessing whether such probable cause existed here, we are guided by well-recognized principles in the context of probable cause for a criminal arrest.  In that context we have held that "[p]robable cause . . . exists where the facts and circumstances within the . . . officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a belief by a person of reasonable caution that a suspect has committed or is committing an offense."  *Smith*, 2014 S.D. 50, ¶ 19, 851 N.W.2d at 724 (first alteration added) (quoting *Hirning*, 1999 S.D. 53, ¶ 13, 592 N.W.2d at 604).  "Probable cause deals with probabilities that are not technical but only the factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act."  *Id.*  The Court views "the action of the . . . officers on the basis of the cumulative effect of [the] facts in the totality of the circumstances."  *State v. Baysinger*, 470 N.W.2d 840, 845–46 (S.D. 1991) (citation omitted); *see also In re H.L.S.*, 2009 S.D. 92, ¶ 15, 774 N.W.2d 803, 808 (recognizing "totality of the circumstances" approach).  "Additionally, probable cause is measured against an

---

2.     The State cites the standard of review in *State v. Horse*, where the Court recognized our deferential review of a court's determination of probable cause to issue a search warrant.  2024 S.D. 4, ¶ 17, 2 N.W.3d 383, 390 (noting that this Court is "not empowered to conduct an after-the-fact de novo probable cause determination[]" when reviewing a court's issuance of a search warrant).  However, that standard is inapplicable here because we are not reviewing the issuance of a search warrant.

objective standard." *Smith*, 2014 S.D. 50, ¶ 20, 851 N.W.2d at 725 (citations omitted).

[¶21.] In the context of an apprehension for the purposes of a mental health evaluation, Parris asserts that the facts here do not support a determination that probable cause existed to meet the criteria in SDCL 27A-10-1. He argues there was no basis to believe he was severely mentally ill under the definitions in Title 27A governing mentally ill persons, which defines severe mental illness, in part, as "substantial organic or psychiatric disorder of thought, mood, perception, orientation, or memory which significantly impairs judgment, behavior, or ability to cope with the basic demands of life." SDCL 27A-1-1(24). He further argues there was insufficient evidence to support a finding that immediate intervention was necessary to keep him from harming himself. He claims that, although his actions that evening were "not the right way to handle things[,]" his messages "were not explicit suicidal threats but rather cries for help and attention," which he claimed were successful. Parris points to the fact that he told the officers he did not intend to harm himself, and he contends that "[o]ne incident of arguably uttering vague suicidal ideations" was insufficient to constitute severe mental illness.

[¶22.] Parris's arguments misconstrue the probable cause standard. Before apprehending and transporting a person to an appropriate facility for a mental health examination, a law enforcement officer is not required to make a diagnosis that the person is, in fact, severely mentally ill under the statutory definition, and conclude that he will actually harm himself. Indeed, whether the person ultimately meets the definitions and criteria of the mental illness statutes are matters within

the realm of the qualified mental health professionals, not law enforcement officers. SDCL 27A-10-3 requires only that the officer has *probable cause to believe* that the person requires emergency intervention under the criteria in SDCL 27A-10-1. It is long understood that probable cause determinations do not demand that an officer's belief be proven correct, as "[t]he process does not deal with hard certainties, but with probabilities." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

[¶23.]     In this case, the officers were presented with concerning reports by people close to Parris, including his mother with whom he lived, that he had been under a lot of stress lately and was emotional and upset that night. He missed joining his family at the baseball game as planned and he disappeared, taking his loaded handgun with him, after first removing the tracking device from the pickup so he could not be located. He sent a suicidal text to his father expressly threatening that he was "done with life." He told Grace he loved her and that she shouldn't "waste her time" as he "wasn't worth it." According to those close to Parris, this was unusual and something he had not done before. When making a probable cause determination, the officers reasonably perceived these actions and statements as more than just vague and inchoate suicidal thoughts.

[¶24.]     Additionally, once Parris came back to the residence and spoke to the officers, he did not dispel their concerns. Parris was carrying his loaded firearm casually in his pocket, not secured in a holster. Also, when talking to the officers, he explained his frustrations, especially those relating to his relationship with his father—a source of obvious emotional pain for Parris that caused him to become

choked up and teary-eyed as he spoke. He admitted that he wanted to make his father feel the way he had been feeling. Parris acknowledged he had been quite upset lately, with his problems seeming like a "pile-on." But despite all of this, when Officer Hood asked if Parris had sought help, he said he had not. He was not willing to do so that evening and made only non-committal comments about doing so in the future.

[¶25.] While Parris claimed he never intended to kill himself, the officers understandably decided not to simply ignore his statements and actions that evening and assume he would be fine with the support of his family members. The totality of the circumstances presented to the officers in this case included not only suicidal statements and actions suggesting that Parris was going to carry out his expressed intentions, but also his concerning emotional state when interacting with the officers. Therefore, the officers' belief that Parris's conduct indicated he was suffering from a severe mental illness and posed a danger to himself such that emergency intervention was warranted was "reasonable and prudent" and supported by probable cause.[3]

> **2. Whether law enforcement's search of a closed container removed from Parris's pocket when he was taken into protective custody was permissible.**

[¶26.] Parris concedes that the search of his person and the removal of the plastic closed container from his pocket prior to his transport to the hospital was

---

3. While this Court assesses probable cause based on the facts and circumstances leading to the officers' decision, comments made later by Parris's counsel at sentencing are notable. Counsel explained that Parris "was undergoing a pretty severe mental health crisis" the night the officers encountered him.

proper and served a legitimate protective purpose as a good-faith, noninvestigatory inventory search. His challenge on appeal, as it was before the circuit court, is limited to law enforcement's opening of the container after it was removed and while he was handcuffed and seated in the patrol vehicle. The State contends, and the circuit court agreed, that this search was appropriate under *Cordell*.

[¶27.] *Cordell* involved a suspect in an arson investigation who, during an interview at the sheriff's office, was determined to be potentially suicidal. As a result, he was placed on a mental health hold at the jail and was thereafter held for an involuntary commitment. Because he was required to change into a jail jumpsuit, his own clothing was placed into a locker at the jail. The next day, law enforcement seized his clothing from the locker and sent it to a laboratory for testing, which revealed the possible presence of an accelerant.

[¶28.] *Cordell* was a habeas corpus case involving an allegation that the defendant's counsel failed to properly challenge the clothing test results. The Court noted in *Cordell* that "[t]he Fourth Amendment of the Constitution guarantees citizens protection from unreasonable searches and seizures by government actors." *Id.* ¶ 12, 673 N.W.2d at 53. Therefore, when law enforcement conducts a warrantless search of a person's property, the State must demonstrate that the search is permissible. *Id.* However, the *Cordell* decision focused on whether Cordell had an objectively reasonable expectation of privacy in his clothing located in the jail locker such that a Fourth Amendment concern was implicated.

[¶29.] The Court first analyzed whether a person taken into protective custody pursuant to the involuntary commitment statutes can lawfully be searched.

The Court looked to *State v. Collins*, 53 P.3d 953, 956 (Utah Ct. App. 2002), where the Utah court approved a pat-down search of an individual before he was placed into protective custody under the civil mental illness statutes, likening it to a search incident to arrest in a criminal case. *Cordell*, 2003 S.D. ¶ 16, 673 N.W.2d at 54 (citing *Collins*, 53 P.3d at 956). *Cordell* recognized the *Collins* court's determination that the purpose of a search incident to protective custody "is to protect not only the peace officer but also the mentally ill individual and others." *Id.* (quoting *Collins*, 53 P.3d at 957). Therefore, "the protective search and subsequent seizure were reasonable and not violative of the Fourth Amendment." *Id.* (citing *Collins*, 53 P.3d at 957). Recognizing that a person placed in protective custody has a lesser expectation of privacy, the *Cordell* Court agreed with *Collins* and held that "a reasonable and limited protective search incident to involuntary commitment is permitted in order to protect the mentally ill individual and that person's custodians." *Id.* ¶ 17, 673 N.W.2d at 54−55.

[¶30.] Additionally, *Cordell* further held that "a limited search under these circumstances is consistent with South Dakota law permitting inventory searches after a person is taken into custody." *Id.* ¶ 18, 675 N.W.2d at 55. In such cases, "'a good faith, noninvestigatory inventory search' is permissible." *Id.* (citations omitted). This is viewed as "an incidental administrative step" that "is supported by a need to (1) safeguard property; (2) insulate the police from groundless claims that property was not protected; and, (3) secure the detention facility by preventing introduction of weapons or contraband." *Id.* (citations omitted). *Cordell* noted that these types of searches apply "equally to criminal arrestees and civil detainees." *Id.*

¶ 19. The Court thus upheld the initial removal and placement of Cordell's clothing in the jail locker as "a reasonable administrative step following his detention." *Id.* ¶ 20.

[¶31.] Here, Parris does not dispute that the above principles permitted law enforcement to conduct the search of his clothing and the removal of the plastic container from his pocket, along with other items that would have otherwise remained on his person, before he was placed in the patrol vehicle and transported to the hospital. But his arguments presume that the rationale identified in *Cordell* and the cases cited therein did not similarly permit the officers to *open* the container. Parris contends the additional analysis in *Cordell* regarding the subsequent seizure of Cordell's clothing for further testing—actions that this Court determined must be based on probable cause to believe the clothing was associated with criminal activity—applies to the opening of the container here. *See Id.* ¶ 23, 673 N.W.2d at 56. This contention is misplaced.

[¶32.] Unlike the facts in *Cordell*, the search of the container found on Parris's person was not done in conjunction with an ongoing criminal investigation. Rather, the search of the container was part of the good-faith, noninvestigatory "administrative step" that was related to "a legitimate custodial purpose." *See id.* ¶¶ 18, 19, 673 N.W.2d at 55 (quoting *State v. Friend*, 711 S.W.2d 508, 510−11 (Mo. 1986)); *see State v. Salcedo*, 695 S.W.3d 109, 117 (Mo. Ct. App. 2024) (applying rationale of *Friend* and upholding search of person prior to being taken into civil protective custody and transported to a mental health facility). Indeed, the search of the container was warranted by the need to safeguard Parris's property, insulate

the police from groundless claims, and ensure that no weapons or contraband were brought into the facility to which he was being taken.

[¶33.] Officer Hood testified that it was necessary to ascertain the contents of the container to keep possible dangerous items or contraband out of the law enforcement vehicle and the facility where they were taking Parris. He explained that the initial intention was to send the container, along with Parris's other personal effects, with him to the facility. When it was found to contain methamphetamine, only this contraband was then seized and taken to the police department. It is apparent from a review of the video recording introduced as evidence that the law enforcement officers were not searching for evidence of a crime when determining whether any of the items in Parris's pockets could accompany him to the hospital. This is further supported by the fact they did not search the vehicle he was driving or arrest him for possession of the methamphetamine and take him to jail that night. As such, this is not a scenario like the civil detention in *Cordell* in which law enforcement sought to further search or examine, for purposes of a criminal investigation, an item already in their possession. *See id.* ¶ 21, 673 N.W.2d at 56.

[¶34.] For these reasons, we conclude that, just as the search of Parris was reasonable and constitutionally permissible, so too was the search of the closed container removed from his pocket. Because no constitutional violation exists, the circuit court did not err in denying Parris's motion to suppress the drug evidence.

[¶35.] We affirm.

#30720

[¶36.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices,

concur.